1  **JASSY VICK CAROLAN LLP**
   JEAN-PAUL JASSY, State Bar No. 205513
2      jpjassy@jassyvick.com
   JEFFREY A. PAYNE, State Bar No. 279034
3      jpayne@jassyvick.com
   800 Wilshire Boulevard, Suite 800
4  Los Angeles, California 90017
   Telephone:  310-870-7048
5  Facsimile:   310-870-7010

6  Attorneys for Defendants
   JASON SEGEL, THE JASON SEGEL
7  COMPANY and PENGUIN RANDOM
   HOUSE LLC (erroneously sued as RANDOM
8  HOUSE LLC)

9

10              **UNITED STATES DISTRICT COURT**

11         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12

13  SOPHIA SEGAL,                          Case No. 20-cv-01382-BAS-JLB

14              Plaintiff,                 Hon. Cynthia A. Bashant

15       vs.                              **DEFENDANTS' NOTICE OF MOTION
                                          AND MOTION FOR JUDGMENT ON
16  JASON SEGEL, an individual; THE       THE PLEADINGS; MEMORANDUM
    JASON SEGEL COMPANY, a                OF POINTS AND AUTHORITIES**
17  Delaware corporation; KIRSTEN
    MILLER, an individual; RANDOM         **Hearing Date:   August 16, 2021**
18  HOUSE LLC, a limited liability
    company; ONEWORLD                     **NO ORAL ARGUMENT UNLESS
19  PRODUCTIONS, an entity of             REQUESTED BY THE COURT**
    unknown type; and DOES 1 through
20  10,                                   [Request for Judicial Notice with
                                          Exhibits 1-2 and Notice of Lodging of
21              Defendants.               Exhibit 3 filed concurrently.]

22

23

24

25

26

27

28

TO PLAINTIFF *IN PROPRIA PERSONA*:

PLEASE TAKE NOTICE THAT on August 16, 2021, Defendants Jason Segel, The Jason Segel Company and Penguin Random House LLC (erroneously sued as Random House LLC) (referred to collectively herein as "Defendants") will and hereby do move this Court, the Honorable Cynthia A. Bashant, presiding, for a judgment on the pleadings to dismiss with prejudice, and without leave to amend, the Amended Complaint (Dkt. 8) filed by Plaintiff Sophia Segal ("Plaintiff").

Defendants bring this motion pursuant to Federal Rule of Civil Procedure 12(c). Defendants' motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice of Exhibits 1-2, the Notice of Lodging of Exhibit 3, all other matters of which this Court may take judicial notice, the pleadings, files, and records in this action, and on any argument heard by the Court.

Pursuant to section 4.A of Judge Bashant's Standing Order for Civil Cases, Defendants did not meet and confer with Plaintiff before filing this Motion, because "the plaintiff is appearing *pro se* and is not an attorney."

DATED:      July 12, 2021          Respectfully submitted,

JASSY VICK CAROLAN LLP


_____/s/Jean-Paul Jassy_____
JEAN-PAUL JASSY
Counsel for Defendants Jason Segel,
The Jason Segel Company and Penguin
Random House LLC

MOTION FOR JUDGMENT ON PLEADINGS
20-cv-01382-BAS-JLB

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................1

II.   STATEMENT OF FACTS ...................................................................2

    A.    Sequence of Pertinent Events ....................................................2

    B.    Synopsis of Plaintiff's Work: "Otherworld (The Gateway)" .................3

    C.    Synopsis of Defendants' Work: *Otherworld* ...........................5

III.  RULE 12(c) STANDARDS ..................................................................6

IV.   PLAINTIFF'S AMENDED COMPLAINT FAILS TO STATE A CLAIM .....7

    A.    Plaintiff's Copyright Claim Is Limited To Her Registered Works..........7

    B.    Plaintiff's Copyright Infringement Claim Fails Because Plaintiff Fails To Plausibly Allege Access, And Cannot, As A Matter Of Law, Show Substantial Similarity ...............................................................8

        1.    Plaintiff Fails To Plausibly Allege Access ...................................9

        2.    Plaintiff's Works Are Not Substantially Similar To Defendants' Work.........................................................................11

            a.    The Court Must First Filter Out Unprotectable Similarities........................................................................13

            b.    Plaintiff's Works Are Not Substantially Similar To Defendants' Work ...........................................................14

    C.    The Trademark Infringement Claim Also Fails as a Matter Of Law ....22

        1.    Plaintiff Cannot Establish That Defendants' Expressive Work Infringes Her Trademark Under The *Rogers v. Grimaldi* Test ....22

        2.    Plaintiff Does Not Adequately Allege the Use of Her Mark In Commerce ................................................................24

V.    CONCLUSION ................................................................................25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abdullah v. Walt Disney Co.*,
No. 2:15-cv-09581-SVW-JPR, 2016 WL 5380930 (C.D. Cal. Mar. 14, 2016) ............................................................................................... 9

*Am. Auto Assoc. of N. Cal., Nev. & Utah v. Gen. Motors LLC*,
367 F. Supp. 3d 1072 (N.D. Cal. 2019) .................................... 25

*Andrade v. United States*,
No. 19-cv-930-BAS-WVG, 2020 WL 835304 (S.D. Cal. Feb. 20, 2020) ......... 6

*Art Attacks Ink, LLC v. MGA Ent. Inc.*,
581 F.3d 1138 (9th Cir. 2009) .................................................. 9, 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................. 8

*Basile v. Sony Pictures Entmn't, Inc.*,
No. CV 14-04264, 2014 WL 12521344 (C.D. Cal. Aug. 19, 2014) ............... 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................. 8

*Benay v. Warner Bros. Entmn't, Inc.*,
607 F.3d 620 (9th Cir. 2010) ........................................ 8, 12, 16, 22

*Berkic v. Crichton*,
761 F.2d 1289 (9th Cir. 1985) ........................................ 9, 13, 22

*Briggs v. Blomkamp*,
70 F.Supp.3d 1155 (N.D. Cal. 2014) .................................... 10, 11

*Briggs v. Cameron*,
No. 20-cv-01596-VC, 2020 WL 6118493 (N.D. Cal. Oct. 16, 2020) ............. 9

*Briggs v. Sony Pictures Ent.*,
714 Fed. App'x 712 (9th Cir. 2018) .................................... 10

*Campbell v. Walt Disney Co.*,
718 F. Supp. 2d 1108 (N.D. Cal. 2010) .............................. 9, 12, 19

*Cano v. A World of Difference Inst.*,
No. C 95-03291 CW, 1996 WL 371064 (N.D. Cal. May 31, 1996) ............... 9

*Carlini v. Paramount Pictures Corp.*,
No. 2:19-cv-8306 (C.D. Cal. Feb. 2, 2021) .......................... 10, 11, 21

*Cavalier v. Random House, Inc.,*
  297 F.3d 815 (9th Cir. 2002) ............................................................ 14, 21

*Christianson v. W. Pub'lg Co.,*
  149 F.2d 202 (9th Cir. 1945) ..................................................................... 9

*Cline v. Reetz-Laiolo,*
  329 F.Supp.3d 1000 (N.D. Cal. 2018) ................................................... 13

*Corbello v. Valli,*
  974 F.3d 965 (9th Cir. 2020) ................................................................. 20

*DC Comics v. Towle,*
  802 F.3d 1012 (9th Cir. 2015) ............................................................... 17

*E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.,*
  547 F.3d 1095 (9th Cir. 2008) ............................................................... 23

*Esplanade Prods, Inc. v. Walt Disney Co.,*
  CV 17-02185, 2017 WL 5635027 (C.D. Cal. Nov. 8, 2017) ...................... 9

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) ................................................................................. 8

*Fillmore v. Blumhouse Prods., LLC,*
  No. 2:16-cv-04348-AB, 2017 WL 4708018 (C.D. Cal. July 7, 2017) ....... 10, 11

*Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC,*
  139 S. Ct. 881 (2019) ............................................................................... 7

*Fulks v. Knowles-Carter,*
  207 F. Supp. 3d 274 (S.D.N.Y. 2016) ................................................... 17

*Funky Films, Inc. v. Time Warner Ent. Co.,*
  462 F.3d 1072 (9th Cir. 2006) ................................... 8, 12, 14, 17, 21

*Gable v. Nat'l Broad. Co.,*
  727 F. Supp. 2d 815 (C.D. Cal. 2010) ................................................... 20

*Garden of Life, Inc. v. Letzer,*
  318 F. Supp. 2d 946 (C.D. Cal. 2004) ............................................... 24, 25

*Gordon v. Drape Creative, Inc.,*
  909 F.3d 257 (9th Cir. 2018) ................................................................. 23

*Griffin v. Peale,*
  No. CV 17-01153 JGB, 2018 WL 5117555 (C.D. Cal. Jan. 18, 2018) ..... 10, 11

*Guichard v. Universal City Studios, LLLP,*
  No. 06-6392 JSW, 2008 WL 11515186 (N.D. Cal. Feb. 13, 2008) .......... 24, 25

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
   896 F.2d 1542 (9th Cir. 1989) ................................................................6

*Harper & Row Publ'rs, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) .......................................................................13

*Hayes v. Keys*,
   No. CV 14-62426 PA, 2015 WL 12734010 (C.D. Cal. Jan. 7, 2015) ...... 10, 11

*Jason v. Fonda*,
   526 F. Supp. 744 (C.D. Cal. 1981) ....................................................10

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (9th Cir. 2003) ...........................................................11

*Kouf v. Walt Disney Pictures & Television*,
   16 F.3d 1042 (9th Cir. 1994) ............................................... 14, 19, 20

*L-7 Designs, Inc. v. Old Navy, LLC*,
   647 F.3d 419 (2d Cir. 2011) ............................................................6

*Lake v. Columbia Broad. Sys., Inc.*,
   140 F. Supp. 707 (S.D.Cal.1956) ......................................................9

*Loomis v. Cornish*,
   836 F.3d 991 (9th Cir. 2016) ....................................................... 10, 11

*Marcus v. ABC Signature Studios, Inc.*,
   279 F. Supp. 3d 1056 (C.D. Cal. 2017) ..............................................21

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002) ..................................................... 23, 24

*Meta-Film Assocs, Inc. v. MCA, Inc.*,
   586 F. Supp. 1346 (C.D. Cal. 1984) .............................................. 10, 11

*Narell v. Freeman*,
   872 F.2d 907 (9th Cir. 1989) .........................................................20

*Olson v. Nat'l Broad. Co.*,
   855 F.2d 1446 (9th Cir. 1988) ................................................ 18, 19, 20, 21

*Rentmeester v. Nike, Inc.*,
   883 F.3d 1111 (9th Cir. 2018) ............................................. 8, 12, 13, 14

*Rice v. Fox Broadcasting Co.*,
   330 F.3d 1170 (9th Cir. 2003) .........................................................8

*Ricketts v. CBS Corps.*,
   439 F.Supp.3d 1199 (C.D. Cal. 2020) ......................................... 7, 9, 12

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ................................................................ 22, 23, 24

*Schkeiban v. Cameron*,
   No. CV 12-0636, 2012 WL 5636281 (C.D. Cal. Oct. 4, 2012) ............ 9, 14, 16

*Sengoku Works, Ltd. v. RMC Int'l, Ltd.*,
   96 F.3d 1217 (9th Cir. 1996) ........................................................................24

*Shame on You Prods., Inc. v. Banks*,
   120 F. Supp. 3d 1123 (C.D. Cal. 2015)....................................................16, 18

*Silas v. HBO*,
   201 F. Supp. 3d 1158 (C.D. Cal. 2016)......................................... 16, 17, 18, 19

*Silas v. HBO*,
   713 Fed. App'x 626 (9th Cir. 2018)..........................................................9, 16

*Silberstein v. Fox Ent. Grp., Inc.*,
   424 F. Supp. 2d 616 (S.D.N.Y. 2004)............................................................25

*Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020)...................................................................8, 12

*Solso v. Maxim Healthcare Svcs., Inc.*,
   No. CV 14-4426-R, 2015 WL 12697727 (C.D. Cal. Mar. 3, 2015) .................6

*Sprint Telephony PCS, L.P. v. Cnty. of San Diego*,
   311 F. Supp. 2d 898 (S.D. Cal. 2004) .............................................................7

*Telegram Messenger, Inc. v. Lantah, LLC*,
   No. 18-cv-02811, 2018 WL 3753748 (N.D. Cal. 2018) ................................25

*Thomas v. Walt Disney Co.*,
   No. C-07-4392 CW, 2008 WL 425647 (N.D. Cal. Feb. 14, 2008)..................9

*Twentieth Century Fox Television v. Empire Distrib.*,
   875 F.3d 1192 (9th Cir. 2017)................................................................ 22, 23

*Van v. Cameron*,
   No. 10cv1051, 2011 WL 13121345 (S.D. Cal. July 13, 2011)............ 9, 16, 18

*Walker v. Time Life Films, Inc.*,
   615 F. Supp. 430 (S.D.N.Y. 1985).................................................................12

*Washington v. ViacomCBS, Inc.*,
   No. CV 40-435 CBM(PJWx), 2021 WL 2640105 (C.D. Cal. May 21, 2020)................................................................................................. 10, 11

*Zella v. The E.W. Scripps Co.*,
   529 F. Supp. 2d 1124 (C.D. Cal. 2007)...........................................................9

## U.S. CONSTITUTION

First Amendment ............................................................................................ 1, 23, 24

## FEDERAL STATUTES

17 U.S.C. § 411(a) ...........................................................................................7

## FEDERAL RULES

FRCP Rule 12(b)(6)...........................................................................................6

FRCP Rule 12(c)................................................................................................6

## MISCELLANEOUS

2 McCarthy on Trademarks and Unfair Competition § 16:11 (5th ed. 2021)............25

1  <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2  **I.    INTRODUCTION**

3        Plaintiff Sophia Segal claims that Defendants infringed the copyrights and

4  trademarks of her script, treatment and marks for an episode of her proposed noir,

5  new age, fantasy television show.  Defendants' young adult, sci-fi, romance novel is

6  different in every protectable (and even unprotectable) way and does not infringe

7  Plaintiff's works, and that can be decided as a matter of law.

8        The operative Complaint offers nothing more than Plaintiff's hypotheses that

9  Defendants or their agents *might* have accessed her works.  The law requires more

10 than such speculation and conjecture; to sufficiently plead access, a copyright

11 plaintiff must offer a direct and plausible pleading of access.  Plaintiff's allegations

12 are insufficient as a matter of law.

13       Beyond pleading deficiencies related to access, Plaintiff's claims suffer a

14 fundamental, incurable defect:  the works at issue are not substantially similar.

15 Substantial similarity requires, at a minimum, that the protectable constituent parts of

16 two works – e.g., their plots, characters, settings, moods and themes – are alike.

17 Random, scattered similarity in individual elements, broad themes, or generic ideas

18 cannot suffice.  Plaintiff cannot show substantial similarity between the works under

19 the Ninth Circuit's objective extrinsic test.

20       Plaintiff and Defendants both have works that use the word "Otherworld" in

21 the title.  That is where the similarities end.  An examination of the actual works, as is

22 routinely done at the pleading stage, reveals no protectable similarities.  The plot,

23 sequence of events, themes, settings, pace, mood, characters and dialogue are all

24 different.  Plaintiff's copyright claim should be dismissed with prejudice.

25       The trademark claim also fails because it is barred by the First Amendment and

26 because Plaintiff inadequately alleges any use in commerce.

27       No amendment can possibly cure the lack of substantial similarity or the First

28 Amendment bar to Plaintiff's copyright and trademark claims.  Defendants therefore

MOTION FOR JUDGMENT ON PLEADINGS
                                        20-cv-01382-BAS-JLB

move this Court for an order dismissing Plaintiff's operative complaint with prejudice and without leave to amend.

## II.    STATEMENT OF FACTS

### A.    Sequence of Pertinent Events

Plaintiff alleges in her operative, first amended complaint (the "FAC") (Dkt. 8)[1] that "her Otherworld screenplay draft" was first uploaded and approved to a website for screenwriters, The Black List, in April 2013.  FAC ¶ 17.  Plaintiff alleges that, on August 21 and 22, 2015, she emailed submissions to various William Morris Endeavor ("WME") agents "with attached legal letter and link to her Otherworld script on The Blacklist," and, on August 27, 2015, she emailed "submissions with attached legal letter and *Otherworld* materials (screenplay treatment titled *Otherworld Teaser*)" to additional WME agents – all of which purportedly provided WME agents access to the "screenplay treatment titled *Otherworld Teaser*" and also "directed agents to her screenplay hosted on The Black List." *Id*. ¶ 18.  "It was at this time" – i.e., late August 2015 – that Plaintiff alleges her "Intellectual Property became known, and freely shared among WME agents, which resulted in [Jason Segel] gaining access not only to Ms. Segal's submitted materials (screenplay treatment titled *Otherworld Teaser*), but access to her screenplay hosted on The Black List." *Id.*  Plaintiff alleges that Segel later "pitch[ed]" his *Otherworld: Last Reality* book series to his co-writer Kirsten Miller, "who in turn gained and shared access to Ms. Segal's Intellectual Property materials." *Id.* ¶ 19.

Plaintiff also alleges that she registered two marks ("*Otherworld*" and "*Otherworld is Just One World Away*") with the USPTO in 2015, but focuses only on the "Otherworld" mark for her trademark infringement claim.  FAC ¶¶ 34, 91, p. 76 at ¶¶ 11-13.

---

[1] The FAC was filed by Plaintiff on October 23, 2020, and it is simply labeled "Complaint" (Dkt. 8), but it is actually a first amended complaint as the original complaint (Dkt. 1) was filed on July 21, 2020.

Plaintiff alleges that an advance copy of Defendants' *Otherworld: Last Reality* book, the first in a three-book *Last Reality* series, was released to the "press and public seven months before the slated publishing date of November 7, 2017" – *i.e.*, in April 2017. *Id.* ¶ 25; *see also id.* (also alleging that the book was "uploaded to the Internet and sold by book collectors for early sales months before … July 2017").[2]

**B.    Synopsis of Plaintiff's Work: "Otherworld (The Gateway)"**

Plaintiff's "Otherworld" is a script for episode one ("The Gateway") of, apparently, a television series. Plaintiff's "Otherworld" episode is difficult to follow, but essentially constitutes a fantasy, noir, drama, action, horror story with heavy doses of psychological and new age rubric. FAC ¶ 93(D); Ex. 2 at 1; *see also* Ex. 1. According to the teaser, it is an "inner" voyage "towards physiological healing and psychic awakening," where characters "face their deepest wounds, uncover hidden drives and reclaim psychic gifts that have been dormant." Ex. 2 at 1.[3]

The script centers on a grown woman, Alethea, who is visited at home by two guides, Moro and Femmale, late one night. The guides remind Alethea that they visited her during her tumultuous childhood, tell Alethea that she is an "Authentic Seer" (which is not defined or explained in the script) living in a "fragmented world," and ask Alethea to follow them to "The Gateway" (also unexplained). Alethea then has flashbacks to her childhood, and she remembers levitating on the playground, intentionally banging her head on playground bars, and a dream sequence in her childhood home where she attacks "an ugly monster," but she is trapped. Alethea explains to Femmale how she suffered silently and she can hear others' "silent screams," and declares she is ready to follow Femmale and Moro, who then guide

---

[2] Plaintiff briefly references the second and third books in Defendants' series, *id.* ¶¶ 26, 58, 91, but it is clear that her copyright claim focuses on the first book in Defendants' series, which is titled *Otherworld: Last Reality*, *see, e.g., id.* ¶¶ 53-58.

[3] The teaser – but not the script – describes Alethea as being in a coma and "locked deep inside" because of a car accident, and the near death experience allegedly "triggers her mind," sending her on a "quest to retrieve lost parts of her soul." *Id.*

1   Alethea through an urban landscape to a power plant.

2   The other primary character, Julian, is a "shadow walker commander"
3   (unexplained) who wants to cross "The Bridge" (unexplained).  In an exotic dance
4   club, Julian solicits help from a suspicious character, The Charlatan, to guide him.
5   They run from and fight henchmen shadow walkers Otto and Egan.  The Charlatan
6   escapes and Julian chases after him.  Julian catches The Charlatan in an alley, and
7   demands to know who The Charlatan "told" (without specifying what Julian is
8   concerned about).  Julian beats up The Charlatan, and yells at The Charlatan because
9   Julian helped The Charlatan get "contacts for underground healers" (unexplained),
10  The Charlatan is too scared to "finish" the job (unexplained), and accuses Julian of
11  being an "imposter" (unexplained).  The Charlatan starts hallucinating and seeing
12  "Lepers."  The Charlatan yells that "they're watching!" (unexplained).  The Charlatan
13  says he is afraid of being drained and disembodied and begs for death.  Julian says he
14  will help The Charlatan get safe passage to The Bridge.  The Charlatan says "Sir
15  Real" (unexplained) as he dies, and Julian sees that the words "Sir Real" are on a
16  brick wall behind him, apparently written in blood.  Julian is knocked to the ground,
17  and the shadow walkers appear.

18  Later, Julian is drugged by the Station Captain, his former boss, in a pseudo-
19  sexual encounter, who tells Julian he must find "Big Mind" (unexplained) in
20  "Otherworld" (also unexplained) and bring him back to her.  In the middle of the
21  exchange the Station Captain inexplicably shoots Otto and Egan.

22  Julian awakens naked in the same power plant that Moro and Femmale have
23  brought Alethea.  Julian runs around the plant being chased and shot at by Moro.
24  Moro then chokes Julian, but Moro begs for forgiveness when he perceives Julian as
25  a young boy (an authentic seer).  Femmale then convinces Alethea to step through the
26  blue "Gateway."  Alethea does so and Julian jumps through at the same time.

27  As the episode ends, a faceless, eyeless half man/half owl begins to guide
28  young child versions of Alethea and Julian across a desert landscape in "Otherworld."

MOTION FOR JUDGMENT ON PLEADINGS
20-cv-01382-BAS-JLB

### C.    Synopsis of Defendants' Work: *Otherworld*

The first book in the Last Reality series, *Otherworld*, is a young adult, sci-fi, action-adventure, thriller, mystery, romance novel.  It tells the story of Simon and Kat, two teenagers who were once best friends, but lost their connection when Simon's absent parents sent him to boarding school after Simon is falsely accused of computer hacking.  Simon, who is secretly in love with Kat, comes back to his hometown in suburban New Jersey, and enrolls in the same high school as Kat.  Simon discovers that Kat is acting strangely with her new group of friends.  Simon, an avid gamer, buys a set of high-end virtual reality ("VR") goggles for himself and for Kat in the hopes of connecting with Kat in Otherworld, a fully immersive, extremely vivid VR gaming experience where participants can feel sensations through their VR avatars.

At a party in an abandoned factory, someone detonates a bomb, leaving several kids injured, including Kat.  Kat supposedly is in a coma, but Simon learns later that the coma is induced by a drug in an IV.  Suspicious medical personnel affix a device (a disk) to the back of Kat's head that enables Kat to "live" in Otherworld.  But, for those with disks (as opposed to VR goggles), injuries to avatars in Otherworld can lead to physical harm – and even death – in real life.  Simon learns that Kat can be found in Otherworld so he affixes a disk to his head as well (having received one under curious circumstances) and searches for Kat in Otherworld.

As the story unfolds and Simon searches for Kat in Otherworld, Simon is assisted in real life by Elvis (his roommate from boarding school and the real hacker culprit), Busara and Marlow (new students at his hometown high school whose parents helped invent Otherworld and the disk technology), and new friends in Otherworld, including avatars Carole (a middle-aged woman) and Gorog (a 14-year-old boy) whose real bodies are also in IV-drug-induced comas and are affixed with disks.  During his adventures in Otherworld, Simon navigates several strange VR cities and landscapes, where he encounters and sometimes battles mythological

creatures and VR players without disks who (unlike Simon, Kat, Carole and Gorog) face no risk of dying in Otherworld.

When Simon is not in Otherworld, he is racing around New Jersey trying to solve the mystery of the explosion at the factory and Kat's body's disappearance to a special facility with other comatose people connected to Otherworld. Ultimately, he learns that Kat's evil stepfather, Wayne Gibson, is one of the high-ranking people at the company responsible for putting and keeping people in comas (including Kat, Carole and Gorog), which it has done in order to test the VR technology to fix the bug that connects injuries/deaths in Otherworld to the real world. Simon also learns that Milo, the immature CEO of the company that created Otherworld, is "living" near full time as a reclusive overlord named Magna in Otherworld. At the end of the first book, Simon rescues Kat, Simon and Kat profess their love for each other, Simon shoots Wayne, and Simon, Kat and Busara go on the run.

## III.   RULE 12(c) STANDARDS

"A Rule 12(c) motion is functionally identical to a Rule 12(b)(6) motion, and the same standard applies to both." *Andrade v. United States*, No. 19-cv-930-BAS-WVG, 2020 WL 835304, at *2 (S.D. Cal. Feb. 20, 2020) (internal quotation marks omitted). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Id.* (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989)). On a Rule 12(c) motion, the court considers the complaint and "any matter of which the court can take judicial notice for the factual background of the case," and the "complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Solso v. Maxim Healthcare Svcs., Inc.*, No. CV 14-4426-R, 2015 WL 12697727, at *1 (C.D. Cal. Mar. 3, 2015) (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)). And

1  "the court does not have to accept as true conclusory allegations that contradict facts

2  that may be judicially noticed or that are contradicted by documents referred to in the

3  complaint." *Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 311 F. Supp. 2d 898,

4  903 (S.D. Cal. 2004).

5  **IV.   PLAINTIFF'S AMENDED COMPLAINT FAILS TO STATE A CLAIM**

6      **A.   <u>Plaintiff's Copyright Claim Is Limited To Her Registered Works.</u>**

7      A work must be registered by the Copyright Office before a plaintiff may bring

8  suit for copyright infringement. *Fourth Estate Public Benefit Corp. v. Wall-*

9  *Street.com, LLC*, 139 S. Ct. 881, 887-88 (2019) (citing 17 U.S.C. § 411(a)).  In her

10  FAC, Plaintiff alleges that she registered her purportedly infringed works – a

11  screenplay draft and a "pitch" or treatment/teaser –with the Copyright Office in April

12  and July 2015, respectively.  FAC ¶ 34, p. 76 ¶ 6.  *See also* Exs. B, C.[4]  She alleges

13  that it was a "screenplay" ("'Otherworld – The Gateway' Episode I") and a fourteen

14  page "screenplay treatment titled *Otherworld Teaser*" that were accessed and

15  infringed.  FAC ¶¶ 3, 17-20, 40-51.[5]  Regardless of the purported similarities she

16  claims, the only relevant comparison is between Defendants' *Otherworld* book (Ex.

17  1) and the registered works that she claims were accessed (Exs. B, C).  *See Ricketts v.*

18  *CBS Corps.*, 439 F.Supp.3d 1199, 1212 (C.D. Cal. 2020) ("consider[ing] only the

19  works that are subject to a registered copyright" and granting motion for judgment on

20  the pleadings).  Materials in, or portions of, unregistered works cannot form the basis

21  of Plaintiff's copyright infringement claim. *E.g.*, *Fourth Estate*, 139 S. Ct. at 887

22

23

24  [4] Plaintiff also references a registered sound recording titled "Medium: Otherworld," FAC ¶ 33, p. 75 ¶ 7, but her FAC does not allege that the sound recording was copied or that it forms the basis of her claims, *see id.* ¶¶ 3, 17-20, 40-51.

25

26  [5] Plaintiff also mentions that when she submitted the screenplay and treatment to "industry professionals," she was "*working on* episodic sequels to "'Otherworld –

27  The Gateway" Episode I', the second being 'Otherworld – The Journey Begins,'" but she does not allege that she shared any such sequels with anybody or that a registered subsequent episode was actually infringed.  *Id.* ¶¶ 40-41 (emphasis added).

28

1  ("registration is akin to an administrative exhaustion requirement that the owner must

2  satisfy before suing to enforce ownership rights").

### B. Plaintiff's Copyright Infringement Claim Fails Because Plaintiff Fails To Plausibly Allege Access, And Cannot, As A Matter Of Law, Show Substantial Similarity.

6  To state a claim for copyright infringement, a plaintiff must allege "(1)

7  ownership of a valid copyright, and (2) copying of constituent elements of the work

8  that are original." *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1076

9  (9th Cir. 2006) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361

10  (1991)).[6]  To plausibly allege the copying element, plaintiff must demonstrate that the

11  defendant "had access to the plaintiff's work and that the two works are substantially

12  similar." *Id.* (internal quotation marks omitted).  These are two separate

13  requirements. *Id.*  Without plausibly alleging both access *and* substantial similarity,

14  the copyright claim cannot survive.[7]

15  Here, Plaintiff's FAC does not plausibly allege either access or substantial

16  similarity, and the Court can dismiss the copyright claim on either basis.  For

17  decades, courts have regularly dismissed copyright claims at the pleadings stage

18  where required elements are missing from a plaintiff's claim, including where a

---

[6] The Ninth Circuit overruled in part a line of cases including *Funky Films*, *Benay v. Warner Bros. Entmn't, Inc.*, 607 F.3d 620 (9th Cir. 2010), *Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018), and *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1177 (9th Cir. 2003) in *Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1066-68 (9th Cir. 2020).  *Skidmore*'s disapproval is limited to these cases' statements that a higher degree of evidence of access permits more minimal allegations of substantial similarity.  *Skidmore*, 952 F.3d at 1066-1069.  As explained below, this case does not involve a high degree of evidence of access, but, in any event, Defendants do not argue for a lower substantial similarity standard.  The other points of law from this line of cases remain valid, and *Skidmore* even cites to *Funky Films* approvingly for authority on the workings of the objective extrinsic test in the substantial similarity analysis.  *See id.* at 1064.

[7] *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

MOTION FOR JUDGMENT ON PLEADINGS
20-cv-01382-BAS-JLB

1   review of the works themselves demonstrate the absence of the requisite similarity.[8]

2   Lack of substantial similarity is a "defect [that] cannot be cured by amendment[.]"

3   *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1116 (N.D. Cal. 2010) (granting

4   motion to dismiss).

5                         **1.**      **Plaintiff Fails To Plausibly Allege Access.**

6          To state a claim for copyright infringement, Plaintiff has the burden to

7   adequately allege and prove that Defendants accessed her purportedly infringed

8   works.  *See Berkic v. Crichton*, 761 F.2d 1289, 1291 (9th Cir. 1985) (plaintiff must

9   allege "the defendant's access to his work").  Allegations of access must demonstrate

10  a "reasonable possibility, not merely a bare possibility" of access; fanciful

11  suggestions, speculation, conjecture and conspiracy theories do not meet the standard.

12  *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009) (finding

13  insufficient allegations of access).  Access "may not be inferred through mere

14

---

15  [8] *See, e.g., Christianson v. W. Pub'lg Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("There
16  is ample authority for holding that when the copyrighted work and the alleged
    infringement are both before the court, capable of examination and comparison, non-
17  infringement can be determined on a motion to dismiss"); *Ricketts*, 439 F.Supp.3d at
    1211-1221, 1226 (granting motion for judgment on the pleadings without leave to
18  amend on substantial similarity grounds); *Schkeiban v. Cameron*, No. CV 12-0636,
    2012 WL 5636281, at *2 (C.D. Cal. Oct. 4, 2012) (dismissing infringement claim
19  involving film *Avatar*);  *Van v. Cameron*, No. 10cv1051, 2011 WL 13121345, at *3-4
    (S.D. Cal. July 13, 2011) (same); *Briggs v. Cameron*, No. 20-cv-01596-VC, 2020 WL
20  6118493, at *1-*2 (N.D. Cal. Oct. 16, 2020) (same); *Silas v. HBO*, 713 F. App'x 626,
    627 (9th Cir. 2018) (affirming dismissal of claim that series *Ballers* infringed
21  plaintiff's work); *Esplanade Prods, Inc. v. Walt Disney Co.*, CV 17-02185, 2017 WL
    5635027, at *53 (C.D. Cal. Nov. 8, 2017) (dismissing claim that film *Zootopia*
22  infringed plaintiff's proposed franchise, also called *Zootopia*); *Abdullah v. Walt
    Disney Co.*, No. 2:15-cv-09581-SVW-JPR, 2016 WL 5380930, at *9 (C.D. Cal. Mar.
23  14, 2016) (dismissing claim that film *Frozen* infringed well-known children's
    author's story); *Lake v. Columbia Broad. Sys., Inc.*, 140 F. Supp. 707, 708
24  (S.D.Cal.1956) (noting that "upon this motion to dismiss the Court may assume
    validity of the copyright and, comparing the literary products incorporated into the
25  complaint, determine as a matter of law whether or not the copyright has been
    infringed," and dismissing complaint); *Cano v. A World of Difference Inst.*, No. C 95-
26  03291 CW, 1996 WL 371064, at *6 (N.D. Cal. May 31, 1996) (granting defendant's
    motion for judgment on the pleadings as to copyright claim); *Zella v. E.W. Scripps
27  Co.*, 529 F. Supp. 2d 1124, 1135-39 (C.D. Cal. 2007) (granting motion to dismiss
    copyright claim for lack of substantial similarity); *Thomas v. Walt Disney Co.*, No. C-
28  07-4392 CW, 2008 WL 425647, at *6 (N.D. Cal. Feb. 14, 2008) (same).

MOTION FOR JUDGMENT ON PLEADINGS
                                                                  20-cv-01382-BAS-JLB

speculation or conjecture" or based on a "speculative" sequence of events.[9]  Thus, "chain[s] of hypothetical transmittals,"[10] "attenuated connections,"[11] and identifications of "potential intermediaries"[12] are likewise insufficient to allege access.  Courts routinely dismiss copyright claims where the operative complaint does not plausibly allege access.  *See*, *e.g.*, *Griffin v. Peale*, No. CV 17-01153 JGB, 2018 WL 5117555, at *5-6 (C.D. Cal. Jan. 18, 2018) (granting motion to dismiss based on lack of plausible access allegations); *Fillmore v. Blumhouse Prods., LLC*, No. 2:16-cv-04348-AB, 2017 WL 4708018, at *4 (C.D. Cal. July 7, 2017) (same); *Hayes v. Keys*, No. CV 14-62426 PA, 2015 WL 12734010, at *2 (C.D. Cal. Jan. 7, 2015) (same); *Washington v. ViacomCBS, Inc.*, No. CV 40-435 CBM(PJWx), 2021 WL 2640105, slip opn. at 4 (C.D. Cal. May 21, 2020) (same).

Plaintiff's alleged posting of a version of her draft screenplay to The Black List, thereby purportedly making it generally available, is insufficient to plead access. The general "availability" of an underlying work does nothing to establish that the relevant defendants actually accessed it.  *Jason v. Fonda*, 526 F. Supp. 744, 776-77 (C.D. Cal. 1981) (availability of hundreds of copies of plaintiff's book in Southern California bookstores did not establish a reasonable possibility of access).  A very similar theory of access to a script on a website for aspiring screenwriters, along with "queries to agents seeking representation" – which is what Plaintiff alleges happened here, *e.g.*, FAC ¶ 18 – was rejected by a district court as "entirely speculative." *Briggs*, 70 F. Supp. 3d at 1166-67, *aff'd as Briggs v. Sony Pictures Ent.*, 714 F. App'x 712 (9th Cir. 2018).  Claiming that a screenplay was posted on a website that was accessed by agents and authors does no more than suggest a "bare possibility" of

---

[9] *Briggs v. Blomkamp*, 70 F.Supp.3d 1155, 1165-66 (C.D. Cal. 2014).

[10] *Meta-Film Assocs, Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984).

[11] *Carlini v. Paramount Pictures Corp.*, No. 2:19-cv-8306, 2021 WL 911683, at *11 (C.D. Cal. Feb. 2, 2021).

[12] *Loomis v. Cornish*, 836 F.3d 991, 996 (9th Cir. 2016).

access.  *See Art Attacks Ink*, 581 F.3d at 1143 (holding that a "slight chance" the defendant encountered plaintiff's work did no more than suggest a "bare possibility" of access, which was insufficient).

Plaintiff's allegation of an unsolicited transmission of her treatment/teaser (which purportedly contained a link to the screenplay on The Black List) to WME agents is also insufficient.  FAC ¶¶ 18-20.  An allegation of mere "corporate receipt of [an] unsolicited work" is insufficient "where there is no evidence of any connection between the individual recipients of the protected work and the alleged infringers."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 48 (9th Cir. 2003).  Plaintiff does not allege that she transmitted anything directly to Defendants or to the book's co-authors' agents at WME.  In fact, she alleges that her unsolicited submissions to WME agents did ***not*** include *Otherworld* co-author Miller's agent.  *Compare* FAC ¶ 18 (listing agents who received Plaintiff's unsolicited submission) *with id.* ¶ 20 (identifying Miller's agent, who was not one of Plaintiff's recipients).

Plaintiff offers only convoluted and hypothetical routes and intermediaries with bare possibilities of how Defendants *might* have accessed her allegedly infringed works.  Plaintiff must present a plausible theory of access and may not simply assume that her screenplay was accessed, read and used by Defendants (or their agents) after she posted it on a website.  Plaintiff's theory that random agents at WME received her communication, read that communication, took the time to go on The Black List to read her screenplay, then passed it along to Segel and/or Miller and/or their agents at WME (who in turn sent it to Segel and/or Miller) relies on the very type of speculation, conjecture, attenuations, hypothetical transmittals, potential intermediaries, and bare possibilities rejected in *Art Attacks*, *Loomis, Jorgensen, Briggs, Meta-Film, Carlini, Griffin, Fillmore, Hayes* and *Washington.*

## 2.  Plaintiff's Works Are Not Substantially Similar To Defendants' Work.

Even assuming she adequately pleaded access – which she did not – Plaintiff

must also demonstrate that Defendants copied "enough of the plaintiff's expression of [her] ideas or concepts to render the [underlying] works 'substantially similar.'" *Rentmeester*, 883 F.3d at 1117. The Ninth Circuit uses both an "intrinsic" (subjective) and an "extrinsic" (objective) test for substantial similarity. *Funky Films*, 462 F.3d at 1077. Here, only the "extrinsic" test is relevant, because it "depends on specific criteria which can be analyzed and decided as a matter of law." *Campbell*, 718 F. Supp. 2d at 1112 (granting motion to dismiss); *Ricketts*, 439 F.Supp.3d at 1211-1221, 1226 (granting motion for judgment on the pleadings); *see also Funky Films*, 462 F.3d at 1077; *Benay*, 607 F.3d at 624.[13]

Under the extrinsic test, courts analyze "objectively compar[able]" similarities between the "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events," "focusing only on the protectable elements of the plaintiff's expression," to determine whether substantial similarities exist between the works at issue. *Rentmeester*, 883 F.3d at 1118 (brackets and citations removed). Plaintiff's extraneous or conclusory allegations and characterizations about the works that contradict the underlying works themselves must be disregarded. *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434 (S.D.N.Y. 1985) (when considering allegations of copyright infringement, "the works themselves supersede and control contrary . . . descriptions of the works as contained in the pleadings"). Courts compare "not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Funky Films*, 462 F.3d at 1077. Filtering is critical to ensure the analysis considers "only whether the *protectable elements, standing alone* are substantially similar." *Id.*

---

[13] The "intrinsic" test is "concerned with a subjective comparison of the works, as it asks whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar." *Skidmore*, 952 F.3d at 1125 (internal quotation marks omitted). Defendants reserve the right to invoke the intrinsic test in this action if necessary, but assert here that Plaintiff fails the extrinsic test as a matter of law, which is sufficient to warrant dismissal, *see* note 8, *supra*.

1    (emphasis in original).

2    **a.    The Court Must First Filter Out Unprotectable Similarities.**

3    In order to focus on only the "protectable elements," courts filter out and

4    exclude unprotectable broad ideas, basic and unoriginal concepts, and scènes à faire

5    from the analysis, *Berkic*, 761 F.2d at 1293, leaving only the "expression[s] . . . that

6    display the stamp of the author's originality," *Harper & Row Publ'rs, Inc. v. Nation*

7    *Enters.*, 471 U.S. 539, 547 (1985).  As the court explained in *Berkic*, "No one can

8    own the basic idea for a story.  General plot ideas are not protected by copyright law;

9    they remain forever the common property of artistic mankind."  761 F.2d at 1293; *see*

10    *also Rentmeester*, 883 F.3d at 1118 (affirming grant of motion to dismiss after

11    filtering out stock elements).  "[I]deas … [elements] from the public domain, …

12    instances in which a particular expression at issue merges with the idea being

13    expressed … and … instance[s] in which the form of the expression is so standard in

14    the treatment of a given idea that it constitutes scenes a faire" must all be filtered out.

15    *Cline v. Reetz-Laiolo*, 329 F.Supp.3d 1000, 1038 (N.D. Cal. 2018).

16    Here, stock concepts must be filtered out, including those that appear in other

17    works pre-dating Plaintiff's works, such as: people in comas,[14] psychological trauma

18    stemming from childhood experiences, characters with psychic abilities, portals to

19    and guides in other worlds, chases and fights (particularly in an industrial setting),

20    and mythological creatures and monsters (particularly half man/half animal

21    creatures).[15]

22

23    ---

[14] Plaintiff's script does not actually have anyone in a coma.  Ex. 2.  And Kat's coma in Defendants' book is induced to use Kat as an experimental subject.  Ex. 1.

24    [15] *See, e.g., The Dead Zone* (1979 book and 1983 film) (protagonist awakens from

25    coma with psychic abilities); *The Matrix* (1999 film) (protagonist, "Neo" or "the One," with special powers led by a guide through futuristic alternate reality with chase/fight scenes in industrial facility); *The Lion, the Witch and the Wardrobe* (1950

26    book) (children find a portal to Narnia, a fantasy world with talking animals and mythical creatures); *The Wizard of Oz* (1900 book and 1939 film) (young woman

27    accompanied by anthropomorphic characters in fantasy world of Oz); *Bridge to Terabitha* (1977 book and 2007 film) (young adults, including one abused by her

28    father, venture to a fantasy world and encounter creatures); *The Phantom Tollbooth*

1   With those elements set aside, there is no similarity in what remains between

2   Plaintiff's works and Defendants' work.

3        **b.      Plaintiff's Works Are Not Substantially Similar To**

4                   **Defendants' Work.**

5        After filtering out unprotectable elements, an analysis of the "plot, themes,

6   dialogue, mood, setting, pace, characters, and sequence of events" shows that

7   Plaintiff's works and Defendants' *Otherworld* are not similar.  *Rentmeester*, 883 F.3d

8   at 1118 (internal brackets omitted); *Funky Films*, 462 F.3d at 1077 (same).

9   Smatterings of "random similarities scattered throughout works are insufficient" to

10  constitute substantial similarity.  *Schkeiban*, 2012 WL 5636281, at *2; *see also*

11  *Cavalier v. Random House, Inc.*, 297 F.3d 815, 825 (9th Cir. 2002) (same); *Kouf v.*

12  *Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994) (Ninth Circuit

13  "unimpressed by [Plaintiff's] compilation of random similarities scattered throughout

14  the works, such as a lawnmower scene, a sprinkler scene, the presence of an attic,

15  danger scenes, concerned parents and kids sleeping outside overnight") (cleaned up).

16       **Plot and Sequence of Events:**  The plot and sequence of events in Plaintiff's

17  and Defendants' respective works are totally dissimilar.  The Otherworld referenced

18  in Defendants' work is a computer-generated, vivid, lifelike VR world that started as

19  a popular and addictive game but is being used to test unwilling subjects for different

20  and dangerous reasons.  The "Otherworld' in Plaintiff's work has no VR component

21  and is, instead, an unspecified spiritual or ethereal realm.  Defendants' work is a story

22  of a teenage boy, Simon, bravely searching through Otherworld for his

23

24  (1961 book and 1970 film) (a boy goes through a magic tollbooth to a fantasy land, and is accompanied by two guides); *Terminator 2: Judgment Day* (1991 film) (fight

25  scenes in industrial facility); *Pan's Labyrinth* (2006 film) (child guided through dark fantasy world by mysterious faun); ancient Greek and Roman mythology and

26  Homer's *The Odyssey* (encounters with creatures and monsters on journey); *The Lightning Thief* (2005 book and 2010 film) (a young man, who learns he has special

27  powers, travels with group to Hades, meeting a satyr and minotaur along the way); *Sybil* (1976 film) (woman who was abused as a child suffers psychological trauma).

28

friend/romantic interest, Kat, who is in trouble, while simultaneously trying to locate and save Kat's comatose body in the real world. Plaintiff's screenplay has no discernable plot (it is really just a pastiche of events without a cohesive story), but appears to be the story of a middle-aged woman's personal journey of psychological healing and psychic awakening interspersed with fight scenes, undeveloped characters who are killed for unexplained reasons without propelling the story (e.g., The Charlatan, Egon and Otto), and vaguely unsettling dreams, flashbacks and premonitions, which would not be explained to the viewer. Defendants' work has the romantic undertones of a teenage love story, without the depiction of much graphic physical encounters. Plaintiff's script, by contrast, includes a randomly intimate encounter between apparent nemeses devoid of romantic undertones. In Defendants' work, the main protagonist, Simon, enters Otherworld in order to search for and help Kat who, like many others, has been involuntarily conscripted into Otherworld as part of a test for a VR device. In Plaintiff's work, the main protagonist, Alethea, is led to the portal for Otherworld, and enters it reluctantly but ostensibly just to help herself (not someone else) gain a healing and awakening. And while a secondary character in Plaintiff's work, Julian, does enter Otherworld willingly, the reasons he enters are not explained – he, too, might be entering Otherworld for the sake of his own personal growth, or he might be entering in order to fulfill the Station Captain's command to find and retrieve "Big Mind," an unexplained figure in Plaintiff's story. Unlike Defendants' work, Plaintiff's works have no discernable plot, no romantic story, no conspiracy to resolve, no peers aiding the protagonist(s), no entry to "Otherworld" involuntarily, and no one being saved from "Otherworld."[16]

---

[16] Plaintiff places great and undue emphasis on a scene "[i]n the beginning of [her] screenplay, when Alethea wakes in bed at 11:11 (pm) and stares at the ceiling." FAC ¶ 93(L); *see also id.* ¶ 93(M) and asserts that this is a "vital key" to the storylines in both works. The FAC likens this near midnight awakening of a grown woman in her home to a scene in Defendants' work when the teenaged boy "Simon wakes in bed [in a hospital] at 11:41 (am) and stares at the ceiling." The fact that Plaintiff believes that this is the key to the similarity between the two works demonstrates how misdirected this suit is. In fact, neither work states that Alethea or Simon "stare at the

**Theme:** The works are also thematically dissimilar.  "A work's theme is its overarching message," *Silas v. HBO*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016), *aff'd*, 713 F. App'x 626, and "general similarities between [] themes, such as saving the world or battles between good and evil are not subject to copyright" protection, *Schkeiban*, 2012 WL 5636281, at *2.  The themes or messages of the works here are totally different.  Defendants' work is a statement about the dangerous lure of technology; how it can trap, incapacitate and isolate those who engage with it; and the greed of technology companies.  Plaintiff's work, by contrast, purports to be an inner journey about psychological healing and psychic awakening.  The FAC tries to manufacture similarity by asserting that the theme of both works is about trying to tell the difference between what is real and what is not.  FAC ¶ 93(F).  That is not at all a fair or accurate description of Defendants' work and does not even seem to be a fair description of Plaintiff's work.

**Setting:** The settings in comparative works must be similar in a meaningful way.  *Benay*, 607 F.3d at 628 (holding that settings were not similar partly because "[t]he Film includes extended scenes in a samurai village" and "[n]o such village appears in the Screenplay"); *Shame on You Prods., Inc. v. Banks*, 120 F. Supp. 3d 1123, 1159 (C.D. Cal. 2015) ("The mere fact that some portion of both works occurs in a city is generic and inconsequential, and thus fails to meet substantial similarity.") (internal quotation marks and citation omitted); *Silas*, 201 F. Supp. 3d at 1176 ("The mere fact that the two shows are set in the same city does not give rise to a finding of substantial similarity of copyrightable expression."); *Van*, 2011 WL 13121345, at *3

---

ceiling".  The cited scene in Defendants' work does not, in fact, occur at "at the beginning of the book," but is nearly 100 pages into the novel.  Most importantly, apart from a character waking in bed, there is nothing in either work that makes these two scenes even roughly similar.  Indeed, one character is waking in late morning, the other near midnight.  And nothing about these scenes (or the times they awaken, which are more than twelve hours apart) is a "vital key" to either story.

MOTION FOR JUDGMENT ON PLEADINGS
20-cv-01382-BAS-JLB

(court found no similarity between works even where each featured "a planet away from Earth . . . homes made in the trees . . . and [] space ships [from] Earth").

Here, the settings are completely different. Defendants' work takes place almost equally in suburban New Jersey and in a VR Otherworld (featuring many "virtual" settings and landscapes, including cities, wastelands and glaciers). Plaintiff's work takes place in a non-descript home, an exotic dance club, a bus stop, city streets and a power plant. The FAC incorrectly alleges that Defendants' work takes place in a power plant. FAC ¶ 93(H). It does not. In another attempt to manufacture similarity, the FAC asserts that Plaintiff's work takes place in a "VR world," FAC ¶ 93(H). This is equally untrue. Critically, there is *no reference* anywhere in Plaintiff's works to a "virtual reality" or any kind of computer-generated simulations. And, contrary to the allegations of the FAC, ¶ 93(C), no characters actually enter any sort of "Otherworld" until the final moments of Plaintiff's work. And when they do, Plaintiff's "Otherworld" is nothing more than a desert landscape, which stands in stark contrast to the many varied virtual settings described in Defendants' view of the Otherworld. The settings are not similar at all.

**Characters:** To receive copyright protection, characters must be "especially distinctive" and "contain some unique elements of expression," and copyright protection does not attach to general archetypes. *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015); *see also Basile v. Sony Pictures Entmn't, Inc.*, No. CV 14-04264, 2014 WL 12521344, at *6 (C.D. Cal. Aug. 19, 2014) ("archetypes . . . such as a 'blonde, blue-eyed hero," [] are thus not 'distinctive' enough to be protectable"); *Fulks v. Knowles-Carter*, 207 F. Supp. 3d 274, 290 (S.D.N.Y. 2016) (the concept of an "ominous figure" is unprotectable). There is no substantial similarity where characters have no counterparts in the works at issue. *Funky Films*, 462 F.3d at 1078-1079 (finding no character similarity where several characters had "no counterpart" in the plaintiff's work). And characters with ostensible surface-level similarities are not substantially similar where they also "have noticeable differences." *Silas*, 201 F.

MOTION FOR JUDGMENT ON PLEADINGS
20-cv-01382-BAS-JLB

1    Supp. 3d at 1177; *see also Van*, 2011 WL 13121345, at *3 (no substantial similarity

2    of characters where "[a]side from the very general similarities . . . there are many

3    important differences between the characters in the two works").

4         The main characters here are totally different.  In Plaintiff's script, the main

5    characters are all adults, there are no teenagers, multiple characters have psychic

6    abilities, the female lead was supposedly hurt in a car accident (which is not actually

7    in the script), the female and male leads are not trying to help each other or anyone

8    else and there is no romantic interest between them.  In Defendant's work, the main

9    characters are teenagers, none of the characters has psychic abilities, the male lead is

10   trying to save the female lead in whom he has a romantic interest, and the female lead

11   was wounded in an intentional attack that is part of the plot of the book.[17]

12        The ancillary characters are different, too.  Defendants' work has absent and

13   evil parental figures, friends in both the real world and Otherworld, and there is no

14   "boss" of one of the main protagonists.  Plaintiff has no parental figures as characters,

15   there are no friends of the protagonists and there is a "boss" figure (the Station

16   Captain) with a violent/sexual connection to the male lead, Julian.[18]

17        **Mood and Pace:**  Courts often look to overall tone, tendencies toward

18   lightness or darkness, and pervasive elements to define a story's mood.  *See Shame*

19   *on You Prods.*, 120 F. Supp. 3d at 1158 ("pace[]" and "genre" affect a story's mood,

20   and a "general mood that flows 'naturally from unprotectable basic plot premises' is

21   not entitled to protection"); *Olson v. NBC*, 855 F.2d 1446, 1451 (9th Cir. 1988)

22   (finding moods "common to the genre of action-adventure television series and

---

[17] Plaintiff also erroneously tries to liken her screenplay to Defendants' work by asserting that her protagonists are on a secret mission to eradicate the creator of Otherworld, but nothing in her script or teaser reveals that.  FAC ¶ 93(P).

[18] Plaintiff's Femmale and Moro characters are background figures that appear to have known and perhaps guided Alethea all her life and encourage her to go to "Otherworld."  There are no analogous figures in Defendant's work.  Contrary to the FAC's contention, ¶ 93(R), Simon's dead grandfather, Kishka, does not play a role similar to, or as significant as, Femmale or Moro.

MOTION FOR JUDGMENT ON PLEADINGS
                                          20-cv-01382-BAS-JLB

1   movies ... do not demonstrate substantial similarity"). The pace of works involve

2   related considerations. *See Silas*, 201 F. Supp. 3d at 1181 ("[t]he timeline of a work

3   is an important factor in determining whether pace is substantially similar");

4   *Campbell*, 718 F. Supp. 2d at 1115 ("[t]he time period within which a movie is set is

5   a factor for determining the pace of the movie"); *Olson*, 855 F.2d at 1451 (although

6   "[b]oth works are quickly paced … these similarities are common to the genre of

7   action-adventure television series and movies and therefore do not demonstrate

8   substantial similarity"). The works at issue in *Kouf*, for example, both involved kids

9   who are shrunk and then enlarged again, but the court ruled that defendant's work, a

10  "light-hearted, family adventure story that takes place almost entirely at the family

11  homes and in a 24-hour period" was not, as a matter of law, substantially similar to

12  Plaintiff's work, which is "a darker adventure that spans a series of days and depicts

13  many locations and a shoot-out." 16 F.3d at 1046.

14      The pace and mood of the works here are distinct. Defendants' work is fast-

15  paced, alternating between "real life" and VR, but always driven by Simon's urgency

16  to connect with and save Kat. It takes place over several days, during the day and

17  night, with frustrating moments caused, for example, by Simon's parents, classmates,

18  his quest for Kat, conflicts with creatures in Otherworld and persons in the real world

19  – all of which are explained as the work progresses. It is told in the first person, it

20  has sporadic and brief fight scenes, and no sexual encounters.

21      In contrast, Plaintiff's work is dark (all taking place in one night), replete with

22  dream sequences, hallucinations and kaleidoscopic experiences. The mood of

23  Plaintiff's work is one of introspective contemplation and new age reflection, with

24  extended scenes of violence some of which are unexplained – such as the deaths of

25  The Charlatan, Otto and Egon. It is not in the first person, and there is no alternation

26  between worlds.

27      **Dialogue.** Plaintiff's FAC tries to cherry-pick snippets of ellipsized dialogue

28  from the two works that is supposedly similar. But "*extended* similarity of dialogue

MOTION FOR JUDGMENT ON PLEADINGS
20-cv-01382-BAS-JLB

1    [is] needed to support a claim of substantial similarity." *Olson*, 855 F.2d at 1450

2    (emphasis added). Dialogues that are "similar in random words, at best," are

3    insufficient to satisfy the extrinsic test for substantial similarity. *Kouf*, 16 F.3d at

4    1046. There is no *extended* similarity of dialogue anywhere in the two works. Even

5    a cursory review of the dialogue referenced in the FAC reveals no similarities. *See,*

6    *e.g.,* FAC ¶ 93.

7        A closer look at the supposed similarities referenced in the FAC reveals no real

8    similarities at all, and the FAC misleadingly tries to connect passages together to give

9    the impression of parallel dialogue. For example, page 58, lines 26-27 of the FAC

10   has the lines "Are you a Seer?" "Are you?" connected to "… really weird …," but the

11   phrase "really weird" does not follow the dialogue about the "Seer" in the Plaintiff's

12   script. *Compare* FAC, p. 58, lines 26-27 *with* Ex. 1 at 52, 53. To purportedly show a

13   parallel, the FAC notes that Defendants' book states "Is she dead? Are you dead?"

14   (which is not similar to "Are you a Seer? Are you?"), and the book's references to a

15   "… turn for the weird …" is not similar to the script's description of a *character* as

16   "really weird looking." FAC, p. 58, lines 26-27, Ex. 1 at 52. These phrases are

17   obviously not the same, and, anyway, short stock phrases do not constitute substantial

18   similarity between two long works' dialogue. *Corbello v. Valli*, 974 F.3d 965, 971

19   (9th Cir. 2020) (no copyright infringement where alleged similarities were based in

20   "common phrases" and other *scènes à faire*). "Ordinary words and phrases are not

21   entitled to copyright protection, nor are 'phrases or expressions conveying an idea

22   typically expressed in a limited number of stereotyped fashions.'" *Gable v. Nat'l*

23   *Broad. Co.*, 727 F. Supp. 2d 815, 847 (C.D. Cal. 2010) (quoting *Narell v. Freeman*,

24   872 F.2d 907, 911-12 (9th Cir. 1989)). Plaintiff's contentions regarding similar

25   dialogue are nowhere near the required "extended similarity of dialogue" for a

26   finding of substantial similarity. *Olson*, 855 F.2d at 1450.

27                                    * * * *

28

The foregoing is just a small articulation of the vast differences between the works.  Any purported similarities are scattered, random and insubstantial.  Plaintiff's FAC, with its liberal use of ellipses, cherry picks items that supposedly appear in the script and the book, without citation.  Plaintiff's FAC purported to add details to Plaintiff's works in an effort to make similarities appear which do not exist.  *See, e.g.*, FAC ¶ 93(AA) (asserting that the "Station Captain secretly wants Sir Real defeated," when that is not apparent from the teaser or script), ¶ 93(OO) (same for assertion that The Charlatan works for Sir Real); ¶¶ 93(QQ), (TT), (YY), (B1), (D1), (E1), (F1) ("Black Vapors" and "Esse" are not mentioned in the script at issue).  As discussed above, the supposed similarities often do not match up at all.  For these reasons, Plaintiff will be wholly unable to demonstrate substantial similarity.

Courts regularly find no substantial similarity as a matter of law even where the underlying works share far more in common than the works here.  For example, in *Funky Films*, 462 F.3d at 1081, the court declined to find substantial similarity where both works included general plot ideas involving a "family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business."  In *Carlini*, 2:19-cv-8306 (C.D. Cal. Feb. 2, 2021), the court found no substantial similarity between a film and screenplay, both of which were romantic comedies about a woman who gains the ability to hear men's thoughts after being hit on the head and hospitalized.  In *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1066 (C.D. Cal. 2017), the court observed that "[w]hile both works involve African American families living in predominately white areas, the concrete elements of the two works are not substantially similar."  The court in *Olson*, 855 F.2d at 1450, held that there was no substantial similarity between two works depicting "group action-adventure series designed to show Vietnam veterans in a positive light."  In *Cavalier*, 297 F.3d at 824, the court agreed with defendants that there was no protection for the "general premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall

asleep."  In *Benay*, 607 F.3d at 625, the court found no substantial similarity despite the fact that both works "share[d] the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising."  And in *Berkic*, 761 F.2d at 1293, the court found no substantial similarity among works describing "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants."  The works here are far less similar than the foregoing examples where substantial similarity was rejected as a matter of law.

### C.    The Trademark Infringement Claim Also Fails as a Matter Of Law

Plaintiff also contends Defendants infringed two of her purported trademarks: U.S. Trademark Registration No. 4917866 for the word mark "OTHERWORLD" in International Class 16 for use with a printed series of fictional screenplays and U.S. Trademark Registration No. 4917868 for the word mark "OTHERWORLD IS JUST ONE WORLD AWAY" in International Class 16 for use with a printed series of fictional screenplays (collectively the "Otherworld Marks").  FAC ¶¶ 34, 1–4 (summary of claims), 10–15 (claim one for trademark infringement).

Plaintiff's trademark infringement claim fails as a matter of law because "Otherworld" is a descriptive term that accurately describes the contents of Defendant's expressive work (*Otherworld*) and does not explicitly mislead consumers as to that book's source.  And it further fails for the independent reason that Plaintiff has not alleged the requisite use in commerce necessary to establish trademark infringement.

### 1.    Plaintiff Cannot Establish That Defendants' Expressive Work Infringes Her Trademark Under The *Rogers v. Grimaldi* Test.

Ordinarily, trademark infringement claims under the Lanham Act are governed by a likelihood-of-confusion test.  *Twentieth Century Fox Television v. Empire Distrib.*, 875 F.3d 1192, 1196 (9th Cir. 2017).  But the Lanham Act does not

MOTION FOR JUDGMENT ON PLEADINGS
20-cv-01382-BAS-JLB

empower trademark holders to deprive authors of their First Amendment ability to title their expressive works using words that aptly communicate the contents of their work. *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989) ("Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict."); *accord Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018) ("…*Rogers* employs the First Amendment as a rule of construction to avoid conflict between the Constitution and the Lanham Act."); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) ("Were we to ignore the expressive value that some marks assume, trademark rights would grow to encroach upon the zone protected by the First Amendment.").

Hence where "the allegedly infringing use is the title of an expressive work," the Ninth Circuit supplants the likelihood-of-confusion test with "a test developed by the Second Circuit in *Rogers v. Grimaldi*." *Twentieth Century Fox*, 875 F.3d at 1196. Defendants' *Otherworld* book is indisputably an expressive work. *E.g.*, *Rogers*, 875 F.2d at 997 ("Movies, plays, books, and songs are all indisputably works of artistic expression and deserve protection."). Under the *Rogers* test, the title of an expressive work does not violate the Lanham Act unless "the defendant's use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads customers as to the source or the content of the work." *Gordon*, 909 F.3d at 264.

Plaintiff's trademark claim fails both *Rogers* prongs as a matter of law. The first prong is met only where the title at issue bears "*no* artistic relevance to the underlying work *whatsoever*." *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008) (emphasis in original); *accord Gordon*, 909 F.3d at 269 ("[T]he level of artistic relevance of the trademark or other identifying material to the work merely must be above zero."). As discussed throughout, the term Otherworld is plainly descriptive of the subject matter of Defendants' *Otherworld* book, which is set in a virtual reality otherworld. The title therefore "conveys a

MOTION FOR JUDGMENT ON PLEADINGS
20-cv-01382-BAS-JLB

message to consumers about what they can expect to discover in the [book] itself." *Mattel*, 295 F.3d at 901 (applying *Rogers* to conclude that the use of "Barbie Girl" as the title of a song critiquing Barbie did not infringe Mattel's "Barbie" trademark). Nor does Defendants' *Otherworld* explicitly mislead as to the book's source. The *only* indication that Plaintiff could even conceivably be associated with Defendant's *Otherworld* is the use of "Otherworld" in the title; "if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity." *Id.* at 902. Plaintiff's trademark claim is squarely barred by the First Amendment under the *Rogers* test.

> ## 2. Plaintiff Does Not Adequately Allege the Use of Her Mark In Commerce.

A further fatal flaw in Plaintiff's trademark claim is her failure to adequately allege priority of her purported Otherworld Marks in commerce. "To show that [she] has a protectable trademark interest, Plaintiff must have been the first to use the mark in the sale of goods or services." *Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946, 957 (C.D. Cal. 2004) (quoting *Sengoku Works, Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996)). To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; "the party claiming ownership must have been the first to *actually use the mark in the sale of goods or services*." *Sengoku*, 96 F.3d at 1219 (emphasis added).

As noted above, Plaintiff contends she uploaded "her Otherworld screenplay draft" to The Black List in April 2013 and subsequently "email[ed] submissions" to various WME agents in August 2015 that "directed agents to her screenplay hosted on The Black List." FAC ¶¶ 17, 18. Plaintiff's posting her screenplay to The Black List and directing a handful of agents to that website is insufficient as a matter of law to establish use in commerce. In *Guichard v. Universal City Studios, LLLP*, for example, the plaintiff—a small independent film producer—alleged that he uploaded "his proposed, unproduced screenplay" titled "Whisper of the Blue" to his website. He sued Universal and sought to enjoin it from using "Whisper" as the title of a film

MOTION FOR JUDGMENT ON PLEADINGS
20-cv-01382-BAS-JLB

it had been producing for years.  The court held that "[a]lthough Plaintiff alleges that there have been multiple visits to his website since its launch …, this minimal use does not establish 'use in commerce' as required to establish priority." *Guichard v. Universal City Studios, LLLP*, No. 06-6392 JSW, 2008 WL 11515186, at *1 (N.D. Cal. Feb. 13, 2008), *aff'd* 363 F. App'x 434 (9th Cir. 2009).  *Guichard* is not an outlier.  *See, e.g.*, *Garden of Life*, 318 F. Supp. 2d at 958–59 (sporadic use of mark on goods and services with no evidence of sales is insufficient to constitute trademark use for establishing priority); *Silberstein v. Fox Ent. Grp., Inc.*, 424 F. Supp. 2d 616, 633 (S.D.N.Y. 2004) (advertisement in attempt to obtain a deal for a motion picture or television series does not constitute use); 2 McCarthy on Trademarks and Unfair Competition § 16:11 (5th ed. 2021) ("The mere fact that a party conceived the idea of a trademark and discussed it with others does not establish priority as of the date of those events.").  At most, Plaintiff's submission of her screenplay to The Black List constitutes mere "preliminary steps" taken in anticipation of using a mark in commerce or a limited/casual use that does not constitute use for purposes of trademark priority.  *See Telegram Messenger, Inc. v. Lantah, LLC*, No. 18-cv-02811, 2018 WL 3753748, at *4 (N.D. Cal. 2018) (preliminary steps such as placing a company name on a letterhead or office door sign is not a use in commerce, nor is use "on a prototype displayed to a potential buyer"); *Am. Auto Assoc. of N. Cal., Nev. & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1099–1100 (N.D. Cal. 2019) (no legitimate use of mark in commerce where the use is only to a small group).

For this additional reason, even accepting Plaintiff's allegations as true, her trademark infringement claim fails as a matter of law and should also be dismissed.

## V.    CONCLUSION

Defendants respectfully request that the Court grant its motion for judgment on the pleadings in full, with prejudice and without leave to amend.

DATED:    July 12, 2021        JASSY VICK CAROLAN LLP
                               _____/s/Jean-Paul Jassy_____
                               JEAN-PAUL JASSY, Counsel for Defendants