**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SOPHIA SEGAL, | Case No. 20-cv-1382-BAS-JLB |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART  DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
| v. | |
| JASON SEGEL, *et al.*, | |
| Defendants. | **[ECF No. 47]** |

Proceeding *pro se*, Plaintiff Sophia Segal ("Plaintiff") commenced this copyright- and trademark-infringement action against Defendants Jason Segel ("Segel"), Kirsten Miller ("Miller"), The Jason Segel Company ("Jason Segel Company"), Random House LLC ("Random House"), and Oneworld Productions ("Oneworld") on July 21, 2020. (Compl., ECF No. 1.) She filed her First Amended Complaint on October 23, 2020. (FAC, ECF No. 8.)  At the heart of the dispute are two written works:  Plaintiff's screenplay entitled *Otherworld (The Gateway): Episode 1* ("Screenplay") and Defendants' book entitled *Otherworld* ("Book").  Plaintiff claims that prior to authoring and publishing the Book Defendants accessed and plagiarized the Screenplay in violation of the Copyright Act.  She also asserts that Defendants' use of Plaintiff's OTHERWORLD trademark in the title of the Book violates the Lanham Act.  (*See* FAC.)

Before the Court is Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c) seeking to dismiss this action for failure to state a claim. (Mot., ECF No. 47.) Plaintiff opposes (Opp'n, ECF No. 56) and Defendants reply (Reply, ECF No. 57). The Court finds the motion suitable for determination on the papers submitted and without oral argument. Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion.

## I.   BACKGROUND[1]

### A.   Factual History

#### 1.   Plaintiff's Works

In December of 2012, Plaintiff completed her original screenplay entitled *Otherworld (The Gateway): Episode 1* (previously defined as "Screenplay"), which she envisioned as the pilot episode of a television show, *Otherworld Original Series*, or the initial film in a franchise. (*Id.* ¶¶ 13, 33, 40; *see* Screenplay, Ex. 1 to Rios Decl., ECF No. 48-2.)

---

[1] These facts are taken from the FAC. For this Rule 12(c) Motion, the Court accepts all of Plaintiff's factual allegations as true. *See Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

These facts also are taken from copies of Plaintiff's Screenplay and her related treatment of the Screenplay entitled *Otherworld Teaser Packet* ("Treatment") obtained from the Copyright Office, as well as a copy of Defendants' Book procured from Amazon, all of which the FAC incorporates by reference. (*See* Request for Judicial Notice, ECF No. 48; Source Works, Exs. 1–3, ECF Nos. 48-2–48-4; *see* Rios Decl. ¶¶ 3–7, ECF No. 48-1.) The incorporation-by-reference doctrine is a limited exception to the general prohibition that a court shall not consider materials outside the four corners of a pleading, and the attachments thereto, when assessing the sufficiency of a complaint under Rules 12(b)(6) or 12(c). *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The doctrine is invoked when a plaintiff "refers extensively" to a document that she does not annex to the complaint. *Id.* at 1002 (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). Incorporation by reference of the source materials clearly is warranted here, as illustrated by the approximately 400 total excerpts from the Screenplay, Treatment, and Book set forth in the FAC. (*See* FAC ¶ 93.) The Court notes that incorporation by reference of the source works in a copyright-infringement action is done routinely. *See*, *e.g.*, *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 256 F. Supp. 3d 1099, 1105 n.1 (S.D. Cal. 2017) (granting request for judicial notice of allegedly infringed and infringing works).

In incorporating the source works, the Court assumes the contents therein are true. *Khoja*, 899 F.3d at 1003 (citing *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2008)). However, that assumption of truth does not apply to disputed facts set forth in Plaintiff's FAC. *See Sgro Danone Waters of N. Am., Inc.*, 532 F.3d 940, 942 n.1 (9th Cir. 2008).

The Screenplay features two protagonists—Alethea and Julian—who are metaphysically connected to one another. (FAC ¶¶ 29–32.) As best the Court can ascertain, the Screenplay tells their separate journeys across "Fray Town" to ultimately meet one another at a portal ("The Gateway") to a virtual-reality world called "Otherworld," which they enter together. (*Id.*) The Screenplay begins with Alethea awakening from a nightmare about her tumultuous childhood to a surprise visit from two vaguely familiar characters from Alethea's past, Mr. Moro ("Moro") and Mademoiselle Femmale ("Femmale"). (Screenplay 1–2, 6–12.) Moro and Femmale apparently are Alethea's "Otherworld Guides" or "Guardians" who have returned to reality (or the veneer of reality) to escort Alethea to Otherworld, with which Alethea has some familiarity (unexplained). (*Id.* 6–12, 14.) They tell her that she is an "Authentic Seer," and, thus, has been gifted with certain supernatural abilities, including the ability to "hea[r] silent screams." (*Id.* 10–11.) The encounter triggers Alethea to experience flashbacks to or visions of her childhood, and Alethea ultimately decides to follow Moro and Femmale to The Gateway. (*Id.* 13–18.) The trio trek across an urban landscape to a power plant in the industrial part of Fray Town where The Gateway apparently is located. (*Id.* 23–28.),

At the same time, Julian is at an exotic dance club with a suspicious character, The Charlatan. (FAC ¶¶ 29–32.) Julian is a commander of the "Shadow Walkers," an apparently antagonizing force whose jurisdiction seemingly spans across Fray Town. (FAC ¶ 29; Screenplay 2.) However, Julian is a "rogue agent" who has solicited The Charlatan to guide him to Otherworld for reasons that are unexplained. (Screenplay 2–5.) Just as Julian begins to suspect that The Charlatan's promise to assist him was an empty one, two Shadow Walker henchmen, Otto and Egan, appear at the nightclub and a fight ensues. (*Id.* 13, 18–23.) In the scuffle, The Charlatan escapes and Julian pursues him. (*Id.* 23.) Julian ultimately captures him in a dark alley where he beats and berates him, demanding that The Charlatan tell him where The Gateway is. (*Id.* 29–32.) During this encounter, The Charlatan begins experiencing paranoid visions, and exclaims "I can't say a word. Because, because they're watching. They're Watching. THEY'RE WATCHING."

(*Id.* 32.)  The Charlatan asks Julian to kill him, to which Julian responds that he will offer him safe passage to The Gateway if The Charlatan helps him.  But The Charlatan suddenly dies, letting out one last utterance, "Sir Real" (unexplained).  (*Id.* 32–33.)  Julian is then knocked unconscious by Otto and Egan.  (*Id.* 33.)  He awakens hours later in the office of his boss, the Station Captain, who, in a pseudo-sexual encounter,  tells Julian he must find "Big Mind" (unexplained) and bring him back to her. (*Id.* 33–38.)  In the middle of the exchange, the Station Captain inexplicably shoots Otto and Egan.  (*Id.* 38.)  With a wave of her hand, the Station Captain entrances Julian into an unconscious state, yet again.  (*Id.* 38.)

He awakens naked in the same power plant that Moro and Femmale have brought Alethea.  (*Id.* 44–45.)  Meanwhile, Alethea, Moro, and Femmale are being pursued by a Shadow Walker who Alethea manages to shoot and kill.  (*Id.* 41–44.)  However, just as they believe themselves to be safe, Moro starts to sense Julian's presence, tracks him down, and pursues him with the intention of killing him.  (*Id.* 46–47.)  However, when Julian tells Moro that he is a rogue agent, Moro sees that Julian, like Alethea, is an Authentic Seer.  (*Id.* 47–48.)  Ultimately, both Alethea and Julian locate The Gateway with assistance from Moro and Femmale and jump through the portal at the same time.  (*Id.* 49.)

As the Screenplay ends, Alethea and Julian arrive in Otherworld's desert terrain; in Otherworld, they no longer look like themselves but instead appear as though they are children.  (*Id.* 52.)  "A tall faceless, eyeless half man/half owl-like creature hold[ing] a long, twisted walking stick" called "The Watcher" welcomes the young child versions of Alethea and Julian to Otherworld and begins to guide them across a desert landscape.  (*Id.* 52–53.)

Shortly after authoring the Screenplay, Plaintiff created a Screenplay treatment entitled *Otherworld Teaser Packet* (previously defined as "Treatment").  (*See* Treatment, Ex. 2 to Rios Decl., ECF No. 48-3.)  In addition to dialogue excerpts from, and a synopsis of, the Screenplay, the Treatment also contains original character artwork and, more importantly, provides some additional information about the premise of Plaintiff's broader

vision for the *Otherworld Original Series* that the episodic Screenplay is lacking. (*Id.*) For example, it explains that Alethea suffered brain damage from a car accident that "triggers her mind, and sends her fragmented psyche on a shamanic request to retrieve lost parts of her soul." (*Id.* 1.) It is unclear, however, how this plotline ties into the Screenplay. Moreover, the Treatment explains that beyond the Screenplay, in the *Otherworld Original Series*, "Alethea and Julian will face [in Otherworld] their deepest wounds and desires, uncover hidden drives and reclaim psychic gifts that have been dormant until now." (*Id.*) Notably, Plaintiff alleges that she has not completed any subsequent episodes of her *Otherworld Original Series*. (FAC ¶ 41 ("[Plaintiff] is currently working on episodic sequels to this work[.]").)

Plaintiff alleges that in early- to mid- 2015, she copyrighted both the Screenplay and Treatment, and that in March of 2015, she obtained a trademark for OTHERWORLD.[2] (FAC ¶ 34.)

In April of 2013, Plaintiff uploaded her Screenplay to a script-hosting website called The Black List. (*Id.* ¶ 15.) According to Plaintiff, The Black List enables screenwriters such as herself "to submit their works and have them evaluated by industry professionals." The Black List assertedly has a proven track record of success, "with more than 200 of its featured scripts collectively earning $16 billion in worldwide box office sales." (*Id.* ¶ 14.) However, Plaintiff does not indicate whether her own Screenplay has gained commercial success or notoriety through The Black List. Additionally, in August of 2015, Plaintiff sent digital copies of her Treatment and links to her Screenplay to thirteen literary agents at William Morris Endeavor ("WME"), the same talent agency that purportedly represents Segel and Miller in their writing endeavors, including the allegedly infringing Book at issue. (*See id.* ¶¶ 18, 20–21.)

---

[2] Plaintiff also alleges in the FAC that she holds the trademark for OTHERWORLD IS JUST ONE WORLD AWAY. (FAC ¶ 34.) However, because the FAC is devoid of any facts alleging infringement of that mark, the Court does not construe that allegation as relevant to any of Plaintiff's claims or the Motion.

20cv1382

### 2.    Defendants' Work

Plaintiff alleges that in December of 2015, The Hollywood Reporter announced that Random House had struck a deal to publish and distribute a young-adult book series to be co-authored by Segel, an actor and author, and his writing partner, Miller.  (FAC ¶ 22 (citing Andy Lewis, *Jason Segel Signs Second Kids' Book Series (Exclusive)*, The Hollywood Reporter (Dec. 17, 2015), https://www.hollywoodreporter.com/lifestyle/arts/jason-segel-signs-second-kids-849816/).)  According to the article, the book series would be called *Otherworld*.  (*Id.*)[3]  However, the series name later was changed to *Last Reality*, which Plaintiff contends was done to "minimize the scope of" Defendants' infringement.  (*Id.* ¶ 26.)

Plaintiff alleges that the first book, entitled *Otherworld (Last Reality)* (previously defined as "Book"), was published and distributed by Random House and Oneworld in late 2017.  (*Id.* ¶¶ 22–24.)[4]   The Book features two protagonists—Kat and Simon—two teenagers who once were best friends until Simon is sent away to boarding school after being falsely accused of computer hacking.[5]  Years later, Simon returns to his hometown and enrolls in the same high school as Kat.  He is disappointed to find that Kat, for whom he has harbored a secret love interest all this time, has a new group of friends.  Unable to connect with Kat, he purchases a virtual-reality headset with the hopes of connecting with Kat in "Otherworld," a fully immersive, extremely vivid virtual-reality gaming-platform where participants can feel sensations through their Otherworld avatars.

At a party attended by Simon, Kat, and their high school classmates in an abandoned factory, someone detonates a bomb that leaves several students—including Kat—injured.

---

[3] The Court may assume to be true the contents of a website the plaintiff incorporates by reference through express citation in the complaint.  *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 460 (E.D.N.Y. 2013).

[4] Since 2017, the remaining two books in the *Last Reality* series have been released.  They are entitled *Otherearth* and *Otherlife*.  (FAC ¶¶ 26–27.)  Plaintiff also alleges that the *Last Reality* series served as a "proof of concept" for a television series Segel wrote and produced, and that AMC Network ordered in 2018, entitled *Dispatches from Elsewhere*.  (*See id.* ¶¶ 88.)

[5] The Court notes that Defendants manually lodged with the clerk of court a hard-copy version of the Book, which is not text-searchable.

Simon believes Kat to be gravely injured and in a coma, but he later learns that bombing was part of an elaborate corporate conspiracy by the gaming company responsible for Otherworld. As it turns out, the company purposefully drug-induced Kat, and others, into a coma so that the company could fit them with a "medical" device (a disk) enabling them to "live" in Otherworld while their unconscious bodies have been placed in a secret industrial complex. For those fitted with this disk, injuries in the Otherworld can lead to physical harm—and even death—in real life.

Upon learning this information, Simon fits himself with a disk and searches for Kat in Otherworld with the assistance of friends, old and new. In the Otherworld, Simon also comes across creatures whose avatars take the embodiment of beastly looking half-man, half-animal creatures and who, in some cases, Simon and his posse must battle in order to move forward with their search for Kat.

When Simon is not in the Otherworld, he is racing around his hometown to solve the mystery of the explosion at the party that led to Kat's disappearance. He discovers a special facility containing comatose people connected to Otherworld and ultimately learns that Kat's evil stepfather, an executive at the video-game company, is responsible for the unethical experiment in which Kat is a nonconsenting participant. The Book ends with Simon shooting Kat's stepfather after a showdown at the industrial facility at which Kat and others have been stowed. Simon then rescues and goes on the run with Kat.

### B.    Procedural History

Plaintiff commenced this action on July 21, 2020 (ECF No. 1) and filed her operative FAC on October 23, 2020 (ECF No. 8). The FAC asserts claims against all Defendants for copyright infringement under the Copyright Act, 17 U.S.C. §§ 501, *et seq.*, and for trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114, *et seq*.

On July 12, 2021, Defendants moved for judgment on the pleadings pursuant to Rule 12(c) on the ground Plaintiff fails to state a single cognizable claim. (ECF No. 47.) With respect to Plaintiff's claim of copyright infringement, Defendants argue Plaintiff can only speculate whether Defendants had access to Plaintiff's Screenplay and Treatment and that,

even *assuming arguendo* Defendants did have access, the minimal similarities between the alleged infringed and infringing works are generic and, therefore, do not give rise to liability under the Copyright Act. (Mot. 8–22.) With respect to Plaintiff's claim of trademark infringement, Defendants argue that their use of Plaintiff's OTHERWORLD mark in the title of the Book is protected by the First Amendment. (Mot. 22–24.)

## II.   LEGAL STANDARD

 Under Rule 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (brackets omitted). Where, as here, "a party invokes Rule 12(c) to raise the defense of failure to state a claim, the motion faces the same test as a motion under Rule 12(b)(6)." *Landmark Am. Ins. Co. v. Navigators Ins. Co.*, 354 F. Supp. 3d 1078, 1081 (N.D. Cal. 2018).

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency" of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court must accept all factual allegations pleaded in the complaint as true and must construe them, and draw all reasonable inferences from them, in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the courts to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Courts must construe *pro se* pleadings liberally.[6] *See Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 925 (9th Cir. 2003); *Germaine Music v. Universal Songs of Polygram*, 130 F. App'x 153, 155 (9th Cir. 2005) (construing with liberality *pro se* plaintiff's copyright infringement claim); *BMW of N. Am., LLC v. Rocco*, CV 19-9285 DSF (PLAx), 2020 WL 7047318, at *3 (C.D. Cal. Nov. 18, 2020) (applying liberality standard to *pro se* plaintiff's trademark infringement claims). However, *pro se* litigants are not entitled to a court's assumption of facts not alleged or drawing of unwarranted inferences. *Iqbal*, 556 U.S. at 679.

## III.   ANALYSIS

The Court first addresses as a threshold issue the absence of allegations in the FAC directed at the Jason Segel Company. After finding that the FAC fails to comply with the minimal requirements of Rule 8(a)(2) with respect to that Defendant, the Court turns next to the sufficiency of the allegations in the FAC against the remaining Defendants.

### A.   Claims Against The Jason Segel Company

"A plaintiff suing multiple defendants 'must allege the basis of h[er] claim against each defendant to satisfy [Rule] 8(a)(2)[.]'" *Altman v. PNC Morg.*, 850 F. Supp. 2d 1057, 1067–68 (E.D. Cal. 2012) (quoting *Gauvin* v. *Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988)); *Steinmetz v. Gen. Elec. Co.*, No. 08CV1635 JM (AJB), 2009 WL 10671319, at *2 (S.D. Cal. Feb. 25, 2009) (same). Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The primary purpose of Rule 8(a)(2) is to ensure the pleading gives a defendant "'fair notice of what plaintiff's claim is and the grounds upon which it rests' in order to enable the [defendant] to answer and prepare for trial, and to identify the nature of

---

[6] Pointing to incomplete versions of the Opposition Plaintiff inadvertently served upon Defendants the night before the pertinent filing deadline, Defendants complain that Plaintiff appears to have had assistance from an unknown source in drafting her Opposition. (Payne Decl. ¶ 4.) Defendants do not request that Plaintiff be stripped of her *pro se* status, nor would such a request be appropriate. *See* ABA Formal Op. 07-446 (May 5, 2007) ("A lawyer may provide legal assistance to litigants appearing before tribunals 'pro se' and help them prepare written submissions without disclosing or ensuring the disclosure of the nature or extent of such assistance.").

the case." *Middleton v. United States*, No. 10-CV-6057 (JFB)(ETB), 2012 WL 394559, at *2 (E.D.N.Y. Feb. 7, 2012) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)); *see also Twombly*, 550 U.S. at 555 (holding Rule 8 requires that a complaint "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests") (alteration in original, citation and internal quotation marks omitted); *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 841–42 (9th Cir. 2007) ("[T]he purpose of a complaint under Rule 8 [is] to give the defendant fair notice of the factual basis of the claim[.]").

While a plaintiff need not provide detailed factual allegations to comply with Rule 8(a)(2), "[s]pecific identification of the parties to the activities alleged by plaintiffs is required . . . to enable the defendant to plead intelligently." *Altman*, 850 F. Supp. 2d at 1068 (quoting *Van Dyke Ford, Inc. v. Ford Motor Co.*, 399 F. Supp. 277, 284 (D. Wis. 1975)); *see also Clark v. Mayfield*, 74 A.F.T.R.2d 94-7323 (S.D. Cal. Nov. 21, 1994) (noting "federal courts repeatedly have required a plaintiff suing multiple defendants to set forth sufficient facts to lay a foundation for recovery against each particular defendant named in the suit" and dismissing claim for plaintiff's "fail[ure] to allege any specific unlawful act" by any particular defendant) (citing *Morabito v. Blum*, 528 F. Supp. 252, 262 (S.D.N.Y. 1981))).

The standard of liberality to which a *pro se* litigant is afforded does not exempt her from having to abide by the rules of the court whose jurisdiction she seeks to invoke. *See Carter v. Comm'r of Internal Revenue*, 784 F.2d 1006, 1008 (9th Cir. 1986). Thus, even a *pro se* litigant must comply with Rule 8(a)(2), and her noncompliance may be met with dismissal, including on a *sua sponte* basis. *See Hearns v. San Bernadino Police Dep't*, 530 F.3d 1124, 1131 (9th Cir. 2008); *McHenry v. Renne*, 84 F.3d 1172, 1179 (9th Cir. 1996) (enunciating noncompliance with Rule 8(a)(2) "is a basis for dismissal independent of Rule 12(b)(6)"); *Nevijel v. N. Coast Life Ins. Co.*, 651 F.2d 671, 673 (9th Cir. 1981) ("A complaint which fails to comply with [Rule 8(a)(2)] may be dismissed"); *Vahidallah v.*

20cv1382

*Chase* Bank, No. 13cv590-MMA (BLM), 2013 WL 3777181, at *4 (S.D. Cal. July 16, 2013) (dismissing, *sua sponte*, *pro se* plaintiff's claims for failure to abide by Rule 8(a)(2)).

As currently constructed, the FAC cannot be said to give the Jason Segel Company fair notice, as required by Rule 8(a)(2). *See, e.g.*, *In re iPhone Application Litig.*, No. 11-MD-2250-LHK, 2011 WL 4403963, at *8 (N.D. Cal. Sept. 20, 2011) ("Plaintiffs' failure to allege what role each Defendant played in the alleged harm makes it exceedingly difficult, if not impossible, for individual Defendants to respond to Plaintiffs' allegations."); *Wright v. Yanos*, No. 2:15-cv-2671-TLN-CKD, 2017 WL 6040335, at *4–5, 9 (E.D. Cal. Dec. 6, 2017) (dismissing complaint pursuant Rule 8 for plaintiff's failure "to allege facts showing how each specific [d]efendant was personally involved or showing how each [d]efendant's acts and/or omissions caused [the alleged] injuries"). The FAC is devoid of any information that might be instructive of the factual basis of Plaintiff's copyright- and trademark-infringement claims against the Jason Segel Company.

"Mere generalizations as to any particular defendant—or even defendants as a group—are insufficient." *See Twombly*, 550 U.S. at 556. Thus, it is insufficient that the FAC repeatedly alleges "Defendants" collectively caused Plaintiff's copyrights and trademarks to be infringed. (*See, e.g.*, FAC ¶ 6 ("*Defendants* are . . . engaging in copyright infringement" (emphasis added)); *id.* at p. 76:12–17 ("*Defendants* are infringing upon said copyrights by borrowing extensively from [Plaintiff's] intellectual property." (emphasis added)), *id.* 76:24–25 ("*Defendants* [sic] use of 'Otherworld' on their works constitutes knowing, deliberate, and willful infringement of Plaintiff's trademark under the Lanham Act." (emphasis added)), *id.* 77:11–12 ("Defendants have reproduced, displayed, distributed, or otherwise copied Plaintiff's copyrighted works without Plaintiff's authorization." (emphasis added))). These sorts of allegations only obfuscate the role the Jason Segel Company purportedly played in the alleged copyright and trademark infringement. *See Smith v. Bank of Am., N.A.*, CV 15-8819-GHK (JEMx), 2016 WL 7444879, at *2 (C.D. Cal. May 11, 2016) (dismissing entire complaint pursuant to Rule 8 finding allegations of wrongdoing merely "lump[ed] multiple Defendants together,"

rendering it impossible "to discern what allegedly wrongful conduct relates to which defendant"); *Vargas v. J.P. Morgan Chase Bank, N.A.*, No. 5:14-CV-0859-ODW (JCGx), 2014 WL 3435628, at \*5 (C.D. Cal. July 11, 2014) (holding "lump pleading" does not provide fair notice under Rule 8(a) because it fails to identify specific actions of each defendant that purportedly violate the law); *cf. United States v. Takemoto v. Nationwide Mut. Ins.*, 674 F. App'x 92 (2d Cir. 2017) (finding allegations of wrongdoing that group defendants together rather than allege each defendant's involvement constitutes "nothing but low-octane fuel for speculation" and is noncompliant with Rule 8(a)(2)).

Accordingly, the Court finds the factual allegations against the Jason Segel Company so lacking that no other result is possible but to dismiss *sua sponte* the claims lodged against it.

\*   \*   \*   \*

Having dismissed Plaintiff's claims against the Jason Segel Company, the Court must determine whether to do so with leave to amend. Because dismissal is pursuant to Rule 8(a)(2), the Court finds Plaintiff should be granted an opportunity to amend her pleading.[7]  *See Faurot v. Terhune*, 357 F. App'x 137, 138 (9th Cir. 2009) (holding district court properly dismissed without prejudice after finding complaint noncompliant with Rule 8(a)(2)). Thus, the Court **DISMISSES WITHOUT PREJUDICE** the claims against the Jason Segel Company. An amended pleading should set forth the factual basis of the Jason Segel Company's involvement in the wrongdoing alleged.

## B.   Copyright Infringement

"Upon obtaining a copyright, an author automatically acquires certain rights that are inherent in the very nature of a copyright." *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1207–08 (9th Cir. 2003) (citing 17 U.S.C. § 106). In the case of literary works, these "exclusive rights" are "to do and to authorize" the following:  (1) "to reproduce the copyrighted work in copies or phonerecords"; (2) "to prepare derivative works based upon the copyrighted

---

[7] The Court finds significant that this is the first instance in which it has noted a deficiency in Plaintiff's pleading. *See Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010).

work"; (3) "to distribute copies or phonerecords of the copyrighted work to the public by sale or other ownership, or by rental, lease, or lending"; (4) "to perform the copyrighted work publicly"; and (5) to "display the copyrighted work publicly." 17 U.S.C. § 106. To prevail on a claim of copyright infringement, a plaintiff must show "(1) ownership of the allegedly infringed work and (2) copying of the protected elements of the work by the defendant." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 984 (9th Cir. 2017) (quoting *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir. 1991)); *see also Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006); *Berkic v. Crichton*, 761 F.2d 1289, 1291 (9th Cir. 1985).

Here, Defendants do not dispute that the Screenplay and Treatment were copyrighted or that Plaintiff is the copyright holder of those works. (*See* FAC ¶¶ 33–34; Mot. 7–8 (acknowledging Plaintiff holds the copyrights she purports in the FAC).) Instead, by their Motion, Defendants challenge that Plaintiff has failed to adequately plead the second element of her copyright infringement claim. (Mot. 8–22; Reply 3–9.)

Courts have construed the second element of a copyright infringement claim to require a showing that "(1) the defendant had access to the copyrighted work prior to the creation of defendant's work and (2) there is substantial similarity of the general ideas and expressions between the copyrighted work and the [allegedly infringing] work." *Unicolors*, 853 F.3d at 984 (citing *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir. 1977)). Defendants argue that Plaintiff fails to satisfy either of these sub-elements. Specifically, Defendants argue that Plaintiff's various theories of access all are speculative and conclusory, and that a comparison between the actual Screenplay and Treatment, on the one hand, and the Book, on the other hand, reveals that there are no protectable similarities between the works.

Therefore, this Court considers whether the FAC raises plausible inferences (1) that Defendants had access to Plaintiff's copyrighted works prior to authoring and publishing their Book and (2) that the Book is substantially similar to the copyrighted works. *See Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).

### 1. Access

To overcome a defense for failure to state a claim on access grounds, "a plaintiff must show a reasonable possibility[,] not merely a bare possibility, that an alleged infringer had the chance to view the protected work[s]." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009). Where the plaintiff lacks direct evidence of access, such a showing can be made on a circumstantial basis. *Unicolors*, 851 F.3d at 985. Indeed, access may be inferred "through either evidence of a 'chain of events . . . between plaintiff's work[s] and defendants' access to th[ose] work[s]' or evidence that 'the plaintiff's work[s] ha[ve] been widely disseminated.'" *Id.* (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000)). Plaintiff argues that her FAC renders reasonable under both theories of access the possibility Segel procured her Screenplay and Treatment prior to co-authoring the Book.

### a. Wide Dissemination

Plaintiff argues that her screenplay was widely disseminated by virtue of it being hosted on The Black List website, a successful script-hosting site Plaintiff purports is visited frequently by industry insiders, as evinced by the commercial success of some of the screenplays that have been uploaded to that site. (FAC ¶¶ 14–19.) Plaintiff asserts that Segel and his literary agents had access to The Black List due to their status within the entertainment industry and, thus, had a reasonable opportunity to view the Screenplay. (*Id.* ¶¶ 16–19.)

The problem with Plaintiff's argument is that it confounds two separate theories of access—chain of access and wide dissemination. Allegations that support a finding of access through wide dissemination are those that enable a court to infer plausibly that the alleged protected works reached an audience sufficiently large and diverse to render reasonable the possibility the alleged infringer himself is among that audience. *See Art Attacks Ink*, 581 F.3d at 1144–45; *Jason v. Fonda*, 526 F. Supp. 774, 776 (C.D. Cal. 1981), *aff'd* 698 F.2d 966 (9th Cir. 1982); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003). Plaintiff's assertion Segel and/or his agents procured the Screenplay through The

20cv1382

Black List by virtue of their industry status seeks to invoke a chain-of-events theory of access, not a wide-dissemination one. *See Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1166 (N.D. Cal. Oct. 3, 2014), *aff'd* 714 F. App'x 712 (9th Cir. 2018) (characterizing as a chain-of-events theory of access the assertion that infringer, a short film-maker, viewed protected work on a film-hosting website because that site is frequented by other short film-makers).

The Ninth Circuit has instructed that "[i]n most cases, widespread dissemination centers on the degree of a work's commercial success and on its distribution through radio, television, and other relevant mediums." *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016). Moreover, although the Ninth Circuit has not identified a specific threshold for the level of public engagement with a work that constitutes "wide dissemination," its precedent indicates that a work's degree of commercial success and/or notoriety must be substantial. *See Rice*, 330 F.3d at 1178 (holding evidence plaintiff sold 17,000 copies of protected video in span of 13 years inadequate to establish wide dissemination); *Art Attack Ink*, 581 F.3d at 1145 (holding evidence plaintiff sold 2,000 t-shirts bearing protected design inadequate to establish wide dissemination).

The FAC does not contain any information that would enable this Court to ascertain the size of the Screenplay and/or Treatment's audience. Plaintiff does not allege how many copies of her Screenplay she has sold or otherwise distributed, nor does she allege how much traffic the specific website domain hosting her Screenplay has received. *Cf. Fonda*, 526 F. Supp. at 776 (assessing sales figures of protected work in determining wide dissemination); *Turner v. Samsung Telecomms, Am., LLC*, No. 13-0629, MWF (VBKx), 2013 WL 12126749, at *4 (C.D. Cal. Nov. 4, 2013) (holding plaintiff failed to allege wide dissemination where complaint lacked facts "about how many times" the protected work was viewed online).

In fact, the only information in the FAC that even tangentially relates to the scope of the Screenplay's reach is Plaintiff's allegations that (1) she sent her Screenplay to two talent agencies, Creative Arts Agency and WME, and (2) she uploaded her Screenplay to a script-hosting website well-known in the entertainment industry. Plaintiff cannot sustain

a wide-dissemination theory of access based on the allegation she sent a small group of literary agents a copy of her screenplay.  *See Rice*, 330 F.3d at 1178 (sale of 17,000 copies insufficient); *Art Attack Ink*, 581 F.3d at 1145 (sale of 2,000 t-shirts insufficient).  Nor can Plaintiff predicate her wide-dissemination theory of access on the bare assertion of internet presence.  Indeed, "[t]he Ninth Circuit has previously stated that[,] although [it] recognize[s] the power of the internet to reach a wide and diverse audience, [internet presence is not necessarily] sufficient to demonstrate wide dissemination." *Fillmore v. Blumhouse Prods., LLC*, 2:16-cv-0439-ABS-SS, 2017 WL 4708018, at *5 (C.D. Cal. July 7, 2017) (quoting *At Attacks Ink*, 581 F.3d at 1145).  Put differently, that a work has the capacity to reach anyone with an internet connection by virtue of its presence on the worldwide web renders it merely possible, not reasonably possible, that the alleged infringer viewed that work.  *See Mestre v. Vivendi Universal U.S. Holding Co.*, No. CV 04-442 MO, 2005 WL 1959295, at *4 (D. Or. Aug. 15, 2005), *aff'd*, 273 F. App'x 631 (9th Cir. 2008) (holding plaintiff could not "establish a regional, national or international distribution of [copyrighted] screenplay" sufficient to infer access without alleging facts showing the screenplay's "commercial success or notoriety").  The FAC simply is without sufficient, additional factual matter to render plausible an inference of wide dissemination of Plaintiff's works.

Accordingly, to the extent Plaintiff seeks to rely upon a wide-dissemination theory of access, the FAC is deficient.

### b.    Chain of Events

Plaintiff also avers two distinct chain-of-events theories of access.  (Opp'n 9–12.)  First, she argues that the Court should infer a reasonable possibility Segel viewed the Screenplay from her allegations that (1) the Screenplay was uploaded to The Black List; (2) The Black List is a go-to source for promising scripts frequently used by key stakeholders in the entertainment industry; and (3) Segel is an important player in the entertainment industry himself.  (*See* FAC ¶ 16.)  As Defendants correctly note, this theory of access is substantially identical to that proffered by the plaintiff, and rejected by the

court, in *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1166 (N.D. Cal. Oct. 3, 2014), *aff'd* 714 F. App'x 712 (9th Cir. 2018).   There, the *Briggs* Court found too speculative the plaintiff's allegation that there was a reasonable possibility the infringer viewed the protected work on a website frequented by Los-Angeles based short film-makers because the infringer himself was a Los-Angeles based short film-maker. *Id.*  This Court finds the *Briggs* Court's reasoning persuasive and reaches the same conclusion here:   it is unreasonable to infer access based on a bare allegation that a protected work can be found in a location that is popular among professionals in an industry of which the infringer is a part.  That allegation is as speculative as it is conclusory.  In so holding, the Court finds it significant that the FAC provides no information explaining why it is that Segel (or his agent) would have been drawn to the Screenplay out of the innumerable other scripts The Black List hosts.  Therefore, the first chain-of-events theory of access proffered by Plaintiff is deficient.

Second, Plaintiff argues that Segel accessed both the Screenplay and the Treatment through intermediaries.  (Opp'n 10.)  Specifically, the FAC alleges that (1) Plaintiff sent to thirteen WME literary agents digital copies of her Treatment and links to The Black List domain hosting her Screenplay and (2) Segel and Miller both are represented by WME literary agents in connection with their *Last Reality Series*.  From these averments, Plaintiff asks the Court to infer that at least one of the literary agents whom Plaintiff solicited either sent the protected works to Segel directly or to his or her colleague(s) actually responsible for representing Segel, who in turn sent the protected works to Segel himself.  (FAC ¶¶ 18–21, 87.)

A plausible inference "that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work[s] is sufficient to establish access by the defendant[s]."  *Loomis*, 836 F.3d at 995 (quoting Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.02[A] (2015) and *Kamar Int'l v. Russ Berrie & Co.*, 657 F.2d 1059, 1062 (9th Cir. 1991)) (alteration in original).  "The dealings between the plaintiff and intermediar[ies] and between the intermediar[ies] and the alleged copier must involve

20cv1382

some overlap in the subject matter to permit an inference of access." *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1358 (C.D. Cal. 1984). Mere "corporate receipt" of a protected work is insufficient without a plausibly alleged "nexus" between the intermediaries and the alleged infringers. *Loomis*, 836 F.3d at 996 (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 48 (2d Cir. 2003)).

Without citing any supporting legal authority, Defendants essentially argue that unless Plaintiff alleges she sent her works to the WME literary agents who are personally responsible for representing Segel and/or Miller, she cannot withstand a Rule 12(b)(6) defense.[8] This standard is far more taxing than anything enunciated by the Ninth Circuit governing what a well-pleaded complaint must allege to render plausible access through an intermediary. Tellingly, the binding precedents Defendants rely upon in support of the premise Plaintiff's allegations of intermediary-based access are insufficient involve summary judgment motions under Rule 56. *See Art Attacks Ink*, 581 F.3d at 1138; *Loomis*, 586 F.3d at 991; *Briggs v. Sony Pictures Entm't*, 714 F. App'x 712 (9th Cir. 2018). They are, thus, inapposite to this discrete issue, for on a Rule 12(c) motion "the court's task is to assess the legal feasibility of the complaint . . ., not to assess the weight of evidence." *Lively v. WAFRA Invs. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)).

Here, Plaintiff pleads adequately that intermediaries, in the form of thirteen WME agents, possessed her works at least four months prior to The Hollywood Reporter article

---

[8] Defendants place great weight upon the assertion in their Motion that none of the thirteen literary agents to whom Plaintiff sent her protected works represented either Segel or Miller personally. (*See* Mot. 11.) Defendants effectively ask the Court to take this assertion as fact because Plaintiff did not explicitly allege any of the thirteen WME literary agents to whom she sent her Screenplay and Treatment are Miller or Segel's own agents. (Mot. 11 (citing FAC ¶¶ 18, 20).) As explained above, Plaintiff need not allege direct transmission of her works to Segel and/or Miller's personal agents to raise an inference of access at this early stage. However, the Court also observes that it may not consider facts presented in briefs on a Rule 12(c) motion, *see In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, 102 F.3d 1524, 1437 (9th Cir. 1996), and, moreover, that the Court must draw all inferences from the allegations in the FAC in favor of Plaintiff, not Defendants. *See W. Reserve Oil & Gas Co.*, 765 F.2d at 1430 (instructing district courts to draw inferences in a light most favorable to the nonmovant).

announcing Segel and Miller would be co-authoring the Book and over two years before the Book was published.  (FAC ¶¶ 18, 22.)  She alleges that those intermediaries were "in a position to transmit [those] work[s] to the creators of the infringing work," Segel and/or Miller, because they worked at the same talent agency that represented Segel and Miller respecting the Book.  *See Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 826 (C.D. Cal. 2010) (citing *Meta-Film*, 586 F. Supp. at 1355–56).  More is not required at this early stage. Plaintiff is entitled to the presumption of truth that the intermediaries received her message and that the intermediaries used their relevant connection as employees of WME to transmit Plaintiff's protected works to Segel, Miller, and/or their agents.  Contrary to Defendants' assertions otherwise, Plaintiff need not allege with the specificity one might expect from a computer forensic investigator how digital copies of Plaintiff's protected works ultimately reached Segel and/or Miller.  These facts reside exclusively within the files of Defendants and/or WME and, thus, Plaintiff is not expected to have knowledge of them prior to discovery.  *See Willford v. City of Portland*, 320 F. App'x 513, 513 (9th Cir. 2009).

Accordingly, the Court finds that, at this stage of the proceeding, Plaintiff has alleged adequately that Defendants had a reasonable opportunity to view Plaintiff's Screenplay and Treatment prior to the creation of the Book.  The Court, thus, denies the strand of Defendants' Motion seeking dismissal on the ground of access.  It does so without prejudice and subject to renewal on summary judgment.

### 2.    Substantial Similarity

In addition to access, a plaintiff also must allege there is "substantial similarity" between the protected works and the purportedly infringing work in order to satisfy the "copying" element of a copyright infringement claim.  *See Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).

Courts within the Ninth Circuit deploy a "two-part" analysis in determining whether defendants copied "enough of the plaintiff's expression of [her] ideas or concepts to render the [underlying works] 'substantially similar.'"  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111,

1117 (9th Cir. 2018); *see also Skidmore*, 952 F.3d at 1064 (instructing that the works "must share substantial similarities and those similarities must involve parts of the plaintiff's work that are original and therefore protected by copyright").  That analysis involves an "intrinsic test" and an "extrinsic test."  *Id.*

"The 'intrinsic test' is a subjective comparison that is left to the trier of fact and focuses on whether the ordinary, reasonable audience would find the total concept and feel of the works to be substantially similar."  *Wild v. NBC Universal Inc.*, 788 F. Supp. 2d 1083, 1098 (C.D. Cal. 2011), *aff'd* 513 F. App'x 640 (9th Cir. 2013); *see also Benay v. Warner Bros. Entm't Inc.*, 607 F.3d 620, 624 (9th Cir. 2010).  However, courts do not apply the intrinsic test where, as here, defendants challenge substantial similarity as a matter of law.  *Funky Films*, 462 F.3d at 1076–78.  They apply the extrinsic test only.  *Id.*

"[T]he extrinsic test compares the objective similarities of specific expressive elements in the [protected and purportedly copycat] works."  *Skidmore*, 952 F.3d at 1064.  "The test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two works," also known as the "constituent elements" of a work.  *Benay*, 607 F.3d at 624 (citing *Cavalier*, 297 F.3d at 822).

"Because the requirement is one of substantial similarity to *protected* elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in plaintiff's work."  *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004) (emphasis in original).  Thus, the extrinsic test as applied to literary works requires analytical dissection—the process of "filter[ing] out and disregard[ing] the [un]protect[ed] elements [of plaintiff's work] in making [the] substantial similarity determination."  *Cavalier*, 297 F.3d at 822 (citing *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990)).  Elements that are "unprotected" include:

> (1) "ideas" as opposed to the "expression" of those ideas; (2) facts, historical events or other information over which no party is entitled to claim a monopoly; (3) elements borrowed from another creator or from the "public domain"; (4) instances in which the particular expression" at issue "merges"

with the "idea" being expressed; and (5) a similar instance in which the form of the "expression" is so "standard" in treatment of a given "idea" that it constitutes *scenes a faire*.

*Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1038 (N.D. Cal. 2018) (citing *Capcom Co. v. MKR Grp., Inc.*, No. C 08-0904 RS, 2008 WL 4661479, at *6 (N.D. Cal. Oct. 20, 2008)); *see also Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985) (holding only "expression[s] . . . that display the stamp of the author's originality are protected by copyright law").

Because analytical dissection and substantial similarity between protected elements of works are "usually extremely close issue[s] of fact," the Ninth Circuit disfavors dismissals on the ground of substantial similarity at the Rule 12(b)(6) stage. *Zindel v. Fox Searchlight Pictures Inc.*, 815 F. App'x 158, 159 (9th Cir. 2020) (instructing district courts to be "cautious" before dismissing for lack of substantial similarity); *see also Astor-White v. Strong*, 733 F. App'x 407, 409–10 (9th Cir. 2018) (Wardlaw, Cir. J., concurring) (proclaiming that resolving substantial similarity "should be even more disfavored on a motion to dismiss" than on motion for summary judgment); *Rentmeester*, 883 F.3d at 1127 (Owens, Cir. J., concurring in part, dissenting in part) ("[Substantial similarity] is an inherently factual question which is often reserved for the jury, and *rarely* for a court to decide at the motion to dismiss stage.") (emphasis added); *cf. Smith v. AMC Networks, Inc.*, No. 18-CV-3803-LHK, 2019 WL 402360, at *4–6 (C.D. Cal. Jan. 31, 2019) (Koh, then-D.J., now-Cir. J.) (declining to apply extrinsic test at pleading stage, finding "most prudent course of action is to follow Ninth Circuit precedent and hold in abeyance the issue of substantial similarity until further factual development of the record, including expert testimony").

Dismissal of a copyright infringement claim on the ground of substantial similarity "is warranted only if, 'as a matter of law[,] the similarities between . . . works are only in uncopyrightable material or are *de minimis*." *Zindel*, 815 F. App'x at 160 (citing 3 William F. Patry, *Patry on Copyright* § 9:86.50 (2020)). "It must be the case that reasonable minds

could not differ on the issue of substantial similarity." *Id.* (citing *L.A. Printex*, 676 F.3d at 848).  To even reach this conclusion at the Rule 12(b)(6) or Rule 12(c) stage, recent Ninth Circuit precedent in *Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018) instructs that (1) "[t]he copyrighted and allegedly infringing works must be presented to the court, such that the works are 'capable of examination and comparison,'" and (2) the court must find that the instant proceeding "is not a case in which discovery could shed light on any issues that actually matter to the outcome" of the extrinsic test.  *Rentmeester*, 883 F.3d at 1123; *see also Zindel*, 815 F. App'x at 158.

Plaintiff urges the Court to hold in abeyance its application of the extrinsic test until the parties have had a chance to conduct discovery and take expert testimony. (Opp'n 6–8.)  In particular, she avers that the record before the Court is insufficiently developed to enable it to undertake the initial process of analytical dissection.  Defendants counter that because all three works are before the Court, capable of examination and comparison, the Court should not hesitate to reach the issue of substantial similarity at the pleading stage. (Mot. 8–9 & n.9; Reply 4–5 & n.4.)   However, as explained above, whether the allegedly infringed and infringing work are part of the record is just one of the requirements for a court to undertake the extrinsic test at the pleading stage.  *See Rentmeester*, 883 F.3d at 1123.  It must also be true that "[n]othing disclosed during discovery could alter the fact that the allegedly infringing works are as a matter of law not substantially similar[.]" *Id.*; *accord Zindel*, 815 F. App'x at 160.  Based on the record before it, the Court is not satisfied that is the case.

As mentioned above, before comparing Plaintiff's and Defendants' works, the Court must separate the protectable elements of the Screenplay and Treatment from the unprotectable ones. *See Cavalier*, 297 F.3d at 822.  Defendants aver that the Court should filter out the following elements of the Screenplay and Book on the ground that they are generic or *scenes a faire*:  "people in comas, psychological trauma stemming from childhood experiences, characters with psychic abilities, portals to and guides in other worlds, chases and fights (particularly in an industrial setting), and mythological creatures

- 22 -

and monsters (particularly half man/half animal creatures)."[9]  (Mot. 13.)  But none of the cases in the trove collected by Defendants provide any justification as to why such elements are unprotectable.  Defendants also assert that Plaintiff borrowed these elements from other pre-existing works, *inter alia*, *The Dead Zone* (1979 book and 1983 film); *The Matrix* (1999 film); *The Wizard of Oz* (1900 book and film); *The Phantom Tollbooth* (1961 book and 1970 film).  (*Id.* n.5.)  Defendants did not ask the Court to take judicial notice of these works, but rather meagerly refer to them in a footnote in their Motion.  *Id.*

This Court finds particularly persuasive Plaintiff's analogy of the instant matter to *Smith v. AMC Networks, Inc.*, 2019 WL 402360, at *1 (C.D. Cal. Jan. 31, 2019), in which then-District Judge, now-Circuit Judge Lucy H. Koh declined to take up the issue of substantial similarity on a motion to dismiss, finding that the Court was unable to separate the protectable elements from the unprotectable ones based on the record before it.  The *Smith* Court found significant the defendants' failure to provide either (1) applicable case law supporting their assertions that certain elements of plaintiff's work were generic and, thus, unprotectable, or (2) the other works to which the defendants referred in support of their assertion certain elements of plaintiff's work were borrowed from another creator and prior works in the public domain and, thus, unprotected.  *Id.* at *4–6.  Consequently, the *Smith* Court held that the most "prudent course of action" would be to deny the motion to dismiss and "follow Ninth Circuit precedent, which clearly states [t]he extrinsic test requires analytical dissection of a work and expert testimony."  *Id.* at *6 (citing *Swirsky*, 376 F.3d at 845).[10]

---

[9] Plaintiff disputes these elements are unprotected.  (Opp'n 22 n.13.)

[10] Defendants' attempts to distinguish *Smith* are unpersuasive.  First, Defendants assert that *Smith* involved assertedly "*less* generic tropes" than those at issue here.  (Mot. 5 n.4 (citing *Smith*, 2019 WL 402360, at *4).)  Putting aside that Defendants provide the Court with no point of reference by which to adjudge that assertion, *Smith* also involved other purported tropes that, generally speaking, appear more generic.  *See id.*, at *4 (listing assertedly generic literary tropes:  "[f]eaturing pirates in a fictional work that involves bodies of water"; "[u]sing an elevator to hide or escape"; and "[u]sing fire to destroy enemies").  Yet the *Smith* Court declined to hold those elements were unprotected.  Defendants' argument only highlights that analytical dissection is an intensive issue of fact upon which reasonable minds might

Like the *Smith* Court, this Court finds that the record and analysis before it are insufficient to resolve the disputed facts concerning which elements of Plaintiff's works are protectable and which are not.  As Defendants correctly argue in their Reply, analytical dissection is a requisite function courts must perform before wading into extensive analysis into the similarities between constituent components of the works.   (Reply 4 (citing *Rentmeester*, 883 F.3d at 1118).)   Accordingly, additional development of the factual record, including expert testimony, would shed light on facts pertinent to the Court's analysis under the extrinsic test.

The Court finds that at this early stage the FAC provides a sufficient basis to conclude the alleged similarities between the constituent components of Plaintiff's Screenplay and Treatment on the one hand, and Defendants' Book, on the other hand, exceed the *de minimis* threshold required to defeat a Rule 12(b)(6) challenge.  *Zindel*, 815 F. App'x at 160 (citing *Patry on Copyright* § 9:86.50).  In so holding, the Court observes that even when the "copied portion" of the infringed work is "relatively small in proportion to the entire work," a claim for copyright infringement may be sustained where that copied portion is "qualitatively important."  *Shaw*, 919 F.2d at 1362–63 (quoting *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1989)).  Here, the Court finds the FAC shows the works at issue to be sufficiently similar to defeat Rule 12(b)(6) challenge.  In particular, Defendants' use of "Otherworld" raises an adequate inference of similarity at this early

disagree, and that expert testimony is particularly helpful in making such determinations, *i.e.*, whether a trope is generic.

Second, Defendants assert that *Smith* is inapplicable to determining the appropriateness of a motion to dismiss a copyright infringement claim relating to literary works because it "relie[s] on *Swirsky v. Carey*, 376 F.2d 841, 845 (9th Cir. 2004), which involved comparing whether musical compositions were in the same key, had the same basslines, pitches, melodies and tempos—all of which are more suitable for expert analysis, and not what this case is about."  (Reply 5 n.4.)  As an initial matter, this argument ignores that *Smith*, itself, did not involve a musical composition—at issue were plaintiff's copyrighted comic book and defendants' television series, similar to the types of work at issue here.  Moreover, *Swirsky* does not contain any language that cabins the rule the extrinsic test "requires analytical dissection and expert testimony" to cases involving musical compositions only, 376 F.2d at 845, nor do the Ninth Circuit's subsequent decisions on the matter indicate such abrogation, *see, e.g.*, *Zindel*, 815 F. App'x at 160 (holding additional evidence, including expert testimony, would also "illuminate" analytical dissection).

stage.  Not only do Defendants use that term as the title of their work, *see Benay*, 607 F.3d at 628–29 ("A title standing alone cannot be copyrighted, but the copying of a title may . . . have copyright significance as one factor in establishing an infringement claim"); *Shaw*, 919 F.2d at 1362 ("The fact that two works have identical titles also weighs in [plaintiff's] favor"), but they also use it to define the virtual-reality world—a centerpiece of the Book—inhabited by strange and dangerous mythical-looking creatures, just as in Plaintiff's Screenplay, *see Baxter*, 812 F.2d at 425 (holding alleged misappropriation of at least six notes in the theme of the movie "E.T." was not necessarily *de minimis*); *Harold Lloyd Entm't, Inc. v. Movement Factory One, Inc.*, No. LA CV15-1556 JAK (MRWx), 2015 WL 12765142, at *7 (C.D. Cal. Oct. 29, 2015) (holding that although assertedly copied portion of film represented approximately one percent of its total length, the scene's import was significant enough to raise a reasonable inference of substantial similarity).  The Court finds this similarity sufficiently idiosyncratic as to raise an inference of similarity, and that the overlap involves a qualitatively significant aspect of Plaintiff's work.  *Shaw*, 919 F.2d at 1362–63; *Heim v. Universal Pictures Co.*, 154 F.2d 480, 488 (2d Cir. 1946) (single brief phrase so idiosyncratic as to preclude coincidence might suffice to show copying).

Accordingly, the Court **DENIES** Defendants' Motion to dismiss Plaintiff's copyright infringement claim, without prejudice and subject to renewal on a motion for summary judgment.

### C.    Trademark Infringement

Plaintiff alleges that since March of 2015 she has held the OTHERWORLD trademark.  (FAC ¶ 33.)  "A trademark is a 'word, name, symbol, or device' that is intended 'to identify and distinguish [the mark-holder's] goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods.'" *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 456 F.3d 1062, 1067 (9th Cir. 2006) (quoting 15 U.S.C. § 1127); *see also Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995) (elucidating the primary purpose of trademark law:  to ensure that consumers can identify the source of goods).  "A valid, registered trademark entitles the holder to prevent others

from using the mark where . . . 'such use is likely to cause confusion, or to cause mistake or de[ception].'" *Au-Tomotive Gold*, 457 F.3d at 1067 (quoting 15 U.S.C. § 1114(a)).

Plaintiff claims that Defendants infringed upon her OTHERWORLD trademark in violation of the Lanham Act by using it in the title of their Book.  (FAC at p. 76:22–25.) "In general, claims of trademark infringement under the Lanham Act are governed by a likelihood-of-confusion test." *Twentieth Century Fox Television v. Empire Distrib.*, 875 F.3d 1192, 1196 (9th Cir. 2017) (citing *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002)).  However, "[w]hen the allegedly infringing use is in the title [or body] of an expressive work," the Ninth Circuit instructs district courts to "apply a test developed by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) to determine whether the Lanham Act applies" ("*Rogers* Test").  *Empire Distrib.*, 875 F.3d at 1196 (citing *Mattel*, 296 F.3d at 902).  Under the *Rogers* Test, Lanham Act liability is precluded unless the plaintiff can show either "the defendant[s'] use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads consumers as to the source of the content of the work." *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018).[11]

This instance is paradigmatic of those in which the Ninth Circuit demands the *Rogers* Test applies.   As mentioned above, the threshold question whether to invoke the *Rogers* Test asks if the defendants' allegedly infringing use is in the title or body of an expressive work.  *Empire Distrib.*, 875 F.3d at 1196.  "Movies, plays, *books*, and songs are all indisputably works of artistic expression and deserve protection" under the First Amendment.  *Rogers*, 875 F.2d at 997 (emphasis added); *see also Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1248 (9th Cir. 2013) (listing books as expressive works); *IOW, LLC v.*

---

[11] This framework, which is more forgiving than the standard "likelihood-of-confusion test," applies because use of a mark in the title or body of an expressive work "implicate[s] the First Amendment right of free speech, which must be balanced against the public interest in avoiding confusion." *Empire Distrib.*, 875 F.3d at 1196.  Moreover, "consumers are less likely to mistake the use of someone else's mark in an expressive work for a signal of association, authorship or endorsement," for the use also can serve other, artistically relevant functions.  *Id.*; *see Mattel*, 296 F.3d at 900 (finding defendant's use of the BARBIE mark in a musical composition was clearly a materialistic critique of Mattel's product, not a misleading ploy aimed at feigning association).

*Breus*, 425 F. Supp.3d 1175 (D. Ariz. 2019) (applying *Rogers* Test to books); *Pomegranate Comms., Inc. v. Sourcebooks, Inc.*, No. 3:19-cv-0119-AC, 2019 WL 7476688, at *1 (D. Or. Dec. 16, 2019) (same).   An allegedly infringing use must "fal[l] outside the title or body of an expressive work" to evade scrutiny under the *Rogers* Test.   *Empire Distrib.*, 875 F.3d at 1196–97.

Construing the allegations in Plaintiff's FAC in a light most favorable to her, she alleges Defendants' infringing use of the OTHERWORLD mark takes place only in the title and body of the Book.   (*See*, *e.g.*, FAC at p. 76:2225 ("Defendants' use of "Otherworld" *on* their works constitutes knowing, deliberate, and willful infringement of Plaintiff's trademark under the Lanham Act.") (emphasis added).)   Accordingly, the *Rogers* Test clearly applies.   *Empire Distrib.*, 875 F.3d at 1196 (allegedly infringing use title of television show); *Mattel*, 296 F.3d at 900 (allegedly infringing use in title and body of musical composition); *IOW*, 425 F. Supp. 3d at 1193 (allegedly infringing use in title and body of book series).

Consequently, the Court must assess whether Plaintiff satisfies either of the two prongs of the *Rogers* Test.   The first prong of the *Rogers* Test requires the plaintiff to show that the defendants' use of the mark is not "artistically relevant." *Gordon*, 909 F.3d at 269; *Empire Distrib.*, 875 F.3 at 1198 ("A mark that has no meaning beyond its source-identifying function is more likely to be used in a way that has 'no artistic relevance to the underlying work whatsoever,' . . ., because the work may be 'merely borrow[ing] another's property to get attention.'" (quoting *Mattel*, 296 F.3d at 902)).   "This is a demanding test." *IOW*, 425 F. Supp. 3d at 1193.   Ninth Circuit law is clear that "the level of artistic relevance of the trademark . . . to the work merely must be above zero." *Gordon*, 909 F.3d at 269. "Even the slightest 'artistic relevance' will suffice; courts and juries should not have to engage in extensive 'artistic analysis.'" *Id.*; *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1110 (9th Cir. 2008) (holding "only the use of a trademark with *no* artistic relevance to the underlying work *whatsoever* does not merit First Amendment protection") (emphasis in original).

Where, as here, the title of a book containing an infringing mark "conveys a message to consumers about what they can expect to discover in the book itself," the artistic relevance threshold is satisfied. *See Mattel*, 296 F.3d at 901. Defendants employ the term "Otherworld" in their Book for an obvious artistically relevant purpose: the virtual-reality world in which Kat is trapped and Simon searches for her is, itself, called "Otherworld." The term "Otherworld" is plainly descriptive of one of the defining features of the Book. Thus, Plaintiff has not satisfied the first prong of the *Rogers* Test.

Turning next to the second prong of the *Rogers* Test, "[t]he Ninth Circuit has been clear that the use of a mark in the title of a work, divorced from other explicitly misleading actions, is not enough to bar First Amendment protection." *Empire Distrib.*, 161 F. Supp. 3d at 909 (citing *Mattel*, 296 F.3d at 902); *Brown*, 724 F.3d at 1246 ("It is well established that the use of a mark alone is not enough to satisfy [the second prong] of the *Rogers* [T]est."); *E.S.S.*, 547 F.3d at 1110 ("[T]he mere use of a trademark alone cannot suffice to make such use explicitly misleading."). Nor is it sufficient to satisfy the second prong of the *Rogers* Test merely to allege "that the defendant's use of the mark would confuse consumers as to the source, sponsorship[,] or content of the work; rather, the plaintiff must show that the defendants' use 'explicitly misleads consumers.'" *Gordon*, 909 F.3d at 266 (quoting *Empire Distrib.*, 875 F.3d at 1199). Put differently, courts generally require that a plaintiff allege the defendants made "an explicit indication," an "overt claim," or "explicit misstatement" that their expressive work was in some way affiliated with the plaintiff. *Empire Distrib.*, 875 F.3d at 1199. However, "in some instances, the use of a mark alone may explicitly mislead consumers about a product's source if consumers would ordinarily identify the source by the mark itself." *Gordon*, 909 F.3d at 269–70 (opining that the second *Rogers Test* prong would be satisfied where, for instance, an artist pastes Disney's trademark at the bottom of a painting that depicts Mickey Mouse).

Here, the Plaintiff does not identify explicitly misleading actions undertaken by Defendants, nor does Defendants' use of the OTHERWORLD mark in their Book speak for itself. Plaintiff alleges only that Defendants' use "is likely to cause confusion in the

marketplace, be it public or within known industries of commerce" (FAC ¶ 5), but as mentioned above, such allegations do not raise an inference of misconduct required to satisfy the second prong of the *Rogers Test*. *See Gordon*, 909 F.3d at 266. Given the absence of any information that invokes an inference Defendants sought to explicitly mislead consumers through their use of Plaintiff's mark, the Court finds Plaintiff does not satisfy either prong of the *Rogers* Test. To hold otherwise would "render *Rogers* a nullity." *Id.*

Accordingly, the Court **GRANTS** Defendants' Motion to the extent it seeks dismissal of Plaintiff's trademark infringement claim.

\*       \*       \*       \*

Because Plaintiff has amended her pleading only once, and because the Court cannot determine based on the allegations in the FAC whether Plaintiff is able to come forward with facts that raise the inference invoking the second prong of the *Rogers* test, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiff's trademark infringement claim.

## IV.   CONCLUSION

For the reasons set forth above, the Court *sua sponte* **DISMISSES WITHOUT PREJUDICE** all claims against Defendant The Jason Segel Company for noncompliance with Rule 8(a)(2) and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion. Specifically, it **DENIES** without prejudice to renewal on a motion for summary judgment Defendants' Motion to the extent it seeks dismissal of the copyright infringement claim for failure to state a cause of action and **DISMISSES WITHOUT PREJUDICE** Plaintiff's trademark claim as precluded by the First Amendment's free-speech protections. If Plaintiff wishes to file an amended pleading that corrects the deficiencies addressed in this Order, she must do so **by no later than March 4, 2022**.

**IT IS SO ORDERED.**

**DATED: January 21, 2022**

Hon. Cynthia Bashant
United States District Judge

- 29 -

20cv1382