# EXHIBIT 1

REPORT OF MARK ROSE

I.  INTRODUCTION

A. ASSIGNMENT

I have been retained in the present litigation by the Defendants to render an opinion on the Plaintiff's claim that the Defendants' novel "Otherworld" is substantially similar in protected original expression to the Plaintiff's materials for a television series entitled "Otherworld."  I have also been asked to render an opinion on whether there are any "striking similarities" between the Defendants' novel and the Plaintiff's "Otherworld" materials.  I understand a "striking similarity" to be one that cannot be explained except by copying.  I am being compensated at the rate of $500 an hour plus expenses.

B. QUALIFICATIONS

In 1961 I graduated from Princeton University with an A.B. in English literature (summa cum laude), after which I studied at Merton College, Oxford, and earned a B.Litt. in English literature from Oxford University in 1963.  In 1967 I received a Ph.D. in English literature from Harvard University.  From 1967 to 1974 I taught English at Yale University, where I held successive positions as Instructor, Assistant Professor, and Associate Professor of English Literature.  From 1974 through 1977 I was Professor of English at the University of Illinois, Urbana, where I also served as Director of Graduate Studies in English.  In 1977 I became a Professor of English at the University of California, Santa Barbara, where I served as Department Chair from 1987 to 1989 and again from 1997 to 2001.  From 1989 through 1994, I was Director of the University of California's system-wide Humanities Research Institute located at UC Irvine, where I also held an academic position as Professor of English and Comparative

Literature.  From September 2002 to September 2005, I served as Associate Vice Chancellor for Academic Personnel at the University of California, Santa Barbara.  I am currently Distinguished Research Professor of English at the University of California, Santa Barbara.

In the course of more than fifty years of employment at various universities I have taught a wide range of literature courses including courses in Shakespeare, Milton, renaissance literature, narrative, drama, fiction, film, popular culture, science fiction, literary theory, and creative writing.  I have published ten books on literary and historical subjects and on the history of copyright.  Five of these are scholarly studies, four are collections of scholarly essays that I have edited, and one is a work of fiction.  I have also written many articles and reviews on literary subjects and on matters related to the history of copyright.  My latest book, *Authors in Court: Scenes from the Theater of Copyright,* a study of authorship and the history of copyright, was published by Harvard University Press in 2016.  A complete list of my publications is attached as part of my *curriculum vitae* (Appendix A).

I was first retained as an expert in litigation alleging copyright infringement in 1980 and testified at trial on that occasion.  Since then I have often been retained as an expert in issues related to copyright infringement and related matters and have testified at trial and by deposition. A complete list of my activity as an expert is included as part of my *curriculum vitae* (Appendix A).

## C.  MATERIALS EXAMINED

In order to arrive at the conclusions I have formed in this matter, I have examined the following materials:

- Plaintiff's "Complaint," filed October 23, 2020 (hereinafter *"Complaint"*);

- Plaintiff's "Teaser Packet," which is referenced in Plaintiff's *Complaint*[1]  (hereinafter *"Teaser Packet"*);

- Plaintiff's revised screenplay for "Otherworld," Episode 1, entitled "The Gateway," dated February 23, 2015 with indication of a previous version copyright March 2, 2013, included in the *Teaser Packet* (hereinafter "*Plaintiff's Screenplay*")[2];

- Plaintiff's "detailed synopsis" for "Otherworld," Episode 2, entitled "The Journey Begins," copyright April 9, 2015 with indication of a previous version copyright March 2, 2013, which Plaintiff referenced in the *Teaser Packet* (hereinafter *Plaintiff's Episode 2 Synopsis*);

- Defendants' novel *Otherworld*, Ember, 2018 (hereinafter "*Defendants' Novel*")[3];

- Defendants' prior novel *Nightmares!*, Yearling, 2014;

- Various online sources including *Wikipedia* and *IMDB*.

### D.  PROCEDURES AND ASSUMPTIONS, AND CONCLUSION

I have been instructed that copyright does not protect ideas but only original expression. Nor does copyright protect commonplaces, stock elements, or *scènes à faire*, which I understand to be elements that flow naturally from a story premise.  In Section II, I provide a general overview of the works in question and an initial statement of my conclusion.  Next, in Section III, I analyze the *Plaintiff's Materials* in relation to the *Defendants' Novel* employing the usual categories for addressing issues of substantial similarity: *Character*, *Plot*, *Sequence of Events*,

---

[1] The *Teaser Packet* I reviewed was attached as an exhibit to a Request for Judicial Notice that Defendants submitted in support of a Motion for Judgment on the Pleadings they filed in July 2021.  I understand Defendants obtained the *Teaser Packet* from the deposit copy of Plaintiff's registered work that Defendants obtained from the U.S. Copyright Office.

[2] The version of *Plaintiff's Screenplay* I reviewed was likewise submitted to the Court as an exhibit to Defendants' Request for Judicial Notice.  I understand that Defendants obtained *Plaintiff's Screenplay* from the deposit copy of Plaintiff's registered work that Defendants obtained from the U.S. Copyright Office.

[3] Defendants also submitted *Defendants' Novel* as an exhibit to their Request for Judicial Notice.

*Setting, Mood or Tone*, *Pace*, *Theme*, *Dialogue*.  I conclude from this categorical analysis that there is no evidence that I have seen that might lead to a finding of substantial similarity in protected original expression between the *Plaintiff's Materials* and the *Defendants' Novel*, much less any striking similarities.  In Section IV, I address the Plaintiff's allegations of similarity as incorporated in the *Complaint*.  I find that these allegations do not survive examination.  Finally, in Section V, I restate my general conclusion that there is no evidence that I have seen that might lead to a finding of substantial similarity in protected original expression between the Plaintiff's work and the *Defendants' Novel*, much less any striking similarities.

## II. OVERVIEW

### A.  "Otherworlds"

The works at issue both employ the general idea of an "other world," a realm significantly different from the familiar everyday world.  Indeed, both employ the title "Otherworld."  I am instructed that titles as such are not protected by copyright.  Nonetheless, I note that the term "Otherworld" has been used multiple times both as a title and in commercial contexts.  "Otherworld" is the title of a 1985 television series in which a family is thrown into another dimension (see https://www.imdb.com/title/tt0088587/?ref_=nv_sr_srsg_0). "Otherworld" is also the title of a 2003 animated fantasy movie drawing on Welsh mythology. This is also known in Welsh as *Y Mabinogi* (see https://en.wikipedia.org/wiki/Y_Mabinogi and https://www.imdb.com/title/tt0376995/?ref_=ttexrv_exrv_tt).  There is also a 2016 movie called *The Otherworld* (see https://www.imdb.com/title/tt2409518/?ref_=fn_al_tt_9).  In addition "Otherworld" is the name of a virtual reality arcade with three sites in Great Britain (see https://www.other.world/).  A company called "Otherworld Miniatures" produces fantasy and horror statuettes (see https://otherworldminiatures.co.uk/).  Furthermore, "Otherworld" is a

registered trademark for a waffles and pancake company (see https://eatotherworld.com).

"Otherworld" is also the name of an "immersive art installation" in Columbus, Ohio (see

https://otherworldohio.com).   I conclude that "otherworld" as a name or title is a commonplace

and its use in the works at issue here does not constitute evidence of copying or substantial

similarity.

 The works at issue both employ the idea of a fantastic realm significantly different from

the ordinary world but this is not evidence of copying or substantial similarity.  Such fantastic

"other worlds" are familiar in innumerable works of fiction with the two modern prototypes

being Lewis Carroll's *Alice's Adventures in Wonderland* (1865) and its sequel *Through the

Looking-Glass* (1871).  Other notable fictions of this kind include L. Frank Baum's *The

Wonderful Wizard of Oz* (1900) and, more recently, Norman Juster's *The Phantom Tollbooth*

(1961) in which a boy is transported to a troubled magical kingdom.   Phillip K. Dick's science-

fiction classic *Ubik* (1969) should be mentioned as well as William Gibson's classic

*Neuromancer* (1984) which introduced the term "cyberspace."  Both involve adventures in a

surreal imaginary realm.  More recently, Neil Gaiman's popular *Coraline* (2002) tells the story

of a little girl who goes through a locked door into a fantastic realm.  Among the most influential

works of this kind are the three installments of the Matrix Trilogy: *The Matrix* (1999), *The

Matrix Reloaded* (2003), and *The Matrix Revolutions* (2003), which feature action in a surreal

cybernetic realm.  Ernest Cline's *Ready Player One* (2011), a novel subsequently made into a

popular film (2018), invokes a fantastic virtual reality game world.

 In addition to these well-known and for the most part classic works, I note that four years

prior to the *Defendants' Novel* at issue in this case, Defendants Jason Segel and Kirsten Miller

wrote and published *Nightmares!* (2014), a children's story that involves a twelve-year-old boy's

magical passage into a fantastic "Netherworld" in an attempt to rescue his kidnapped brother from a witch.  The Defendants' work currently at issue in which the youthful protagonist enters a fantastic virtual world to rescue his girlfriend may be regarded as an elaboration and reprise of the same general idea of adventure in a fantasy realm.

I conclude that the obvious fact that both the Plaintiff's and the Defendants' works involve magical "other worlds" is not in itself significant in this matter.

B.  The Works at Issue

1.  Plaintiff's Materials

The Plaintiff's projected "Otherworld" show is most concretely represented by a 54 pp. screenplay entitled "The Gateway," which is presented as the pilot episode for the series.  This screenplay is included in the *Plaintiff's Materials*, a collection of idea pitch materials that incorporates, in addition to the screenplay, evocative illustrations – suggestive texts accompanied by "character design" drawings – of the principal characters.

The central figure in the *Plaintiff's Screenplay* – and presumably in the projected television series – is Alethea, a woman in her mid-30's with psychic gifts.  The screenplay begins with a dream-sequence flashback to Alethea's childhood in which she rejects her mother's appeal to join the family in front of the television.  After this the adult Alethea wakes in a sweat in her apartment.  We then cut to an "exotic" night club where Julian, the male lead, is watching nude dancers with, mysteriously, projected images of Alethea on their bodies.  Julian asks a companion, the Charlatan, to take him to the "Bridge."  Meanwhile back in Alethea's apartment, two mysterious characters, Mademoiselle Femmale – Femmale appears to be something of a hermaphrodite, as her name implies – and her companion, Mr. Moro, explain that Alethea is a "seer" and that they have come to lead her through the "Gateway."  In a flashback

Alethea recalls being a child and levitating in a playground, after which, in the present, she has a vision of Julian and tells Mademoiselle Femmale she is "ready." At the "exotic" club two "Shadow Walkers" – mysterious threatening characters – seek Julian who fights them and then flees.

While Mademoiselle Femmale explains to Alethea the nature of the "fragmented" world and the need for "clarity" to penetrate Otherworld, Julian, pursued by the Shadow Walkers, kills Charlatan and then collapses, experiencing a dream vision of Alethea. We next find Julian in the office of the mysterious and threatening Station Captain. The female Station Captain – something of a dominatrix – kisses and gropes Julian, commanding him to find "Big Mind" in Otherworld. Meanwhile, Alethea, accompanied by Mademoiselle Femmale and Moro, have arrived at a power plant. This we will learn is the site of the "Gateway," the mysterious portal to "Otherworld." Julian, beat-up and naked after his encounter with the Station Captain, awakes at the power plant and sees Alethea, recognizing her from his visions and dreams. Following Alethea into the power plant, Julian kills a Shadow Walker, puts on his clothes, and pursues Alethea. As Alethea and Mademoiselle Femmale approach the Gateway, Moro grabs Julian, assuming he is a Shadow Walker. But then, recognizing Julian as an "authentic seer," Moro directs him to the Gateway. Alethea, equipped by Mademoiselle Femmale with goggles, passes through the Gateway, followed by Julian, and Mademoiselle Femmale remarks, "The journey begins."

An epilogue reveals a desert landscape on the other side of the Gateway where the mysterious Watcher – half man and half owl – greets Alethea and Julian, now transformed into a young girl and boy, "*Authentic Seers* in their purest form" (*Plaintiff's Screenplay*, p. 51). The boy reads aloud a message welcoming them to Otherworld and explaining that the Watcher is to

be their guide.  Hand in hand, the girl and boy set off together into the desert.

In addition to the *Plaintiff's Screenplay* the *Plaintiff's Materials* include *Plaintiff's Episode 2 Synopsis* entitled "The Journey Begins."  This describes Alethea and Julian – who appear to alternate between their childhood and adult forms during the episode – traveling by canoe to a mysterious house.  Julian departs to follow an "elusive figure" while Alethea discovers a room that resembles her childhood bedroom from which she flees, pursued by a black vapor in the form of her sister.  After this Alethea and Julian explore the town, finding a strange used clothing shop.  A mysterious man morphs into Julian's father, then vanishes, while Alethea engages with a cat that reminds her of a childhood pet. The shop owner gives Julian a business card marked "B.M." that apparently alludes to "Big Mind."  Confused and frantic, Alethea and Julian stand in the middle of an empty street.  These incidents are intercut with a secondary narrative focused on the Station Captain who is threatened by the unexplained figure, "Sir Real."  Later the Station Captain reappears disguised as a vagrant.

### 2.  *Defendants' Novel*

This is a 355 page fantasy adventure novel designed for a "young adult" target audience – that is, according to the American Library Association, kids aged 12 to 18 years.  Appropriately for this target audience, Simon, the protagonist, is 18.  Simon who is Jewish, lives in a wealthy New Jersey suburb, where he has met and fallen in love with Kat, a girl of his age.  Returning from boarding school, Simon, disturbed that Kat has not kept in touch, follows her to a kids' party in an abandoned factory that collapses, severely injuring Kat and supposedly leaving her with "locked in syndrome" – that is, fully conscious in a body that cannot function.  At the hospital where Kat is being treated, representatives from the "Otherworld" gaming company fit her with an advanced kind of virtual reality hardware that taps directly into her brain, giving her

the possibility of some kind of virtual life.

A new phase of the story begins when Simon, experimenting with the VR equipment, launches himself into the otherworld, seeking to find and rescue Kat. Simon finds himself in a beautiful city where he is approached by a figure, the Clay Man, who identifies himself as Simon's guide, explaining that the exit from otherworld lies inside a glacier and that to escape Simon must kill the giant Magna, revelations that do indeed set up the adventure's end. As he travels Simon is joined by three other players in their otherworld forms: a knight, an ogre, and a woman. The quartet of adventurers journeys first to Imra, a resort city of luxury and recreation, conspicuously reminiscent of the Circe episode of the *Odyssey*.

An interval in New Jersey follows in which Simon, waking, discovers there have been dozens of cases of "locked in syndrome" and that the collapse of the factory in which Kat was injured was not an accident. Back in Otherworld, Simon and his companions travel through the wealthy realm of Mammon characterized by cannibalism: "We all consume people on our way up the ladder," explains one resident (p. 246). Then back in New Jersey, Simon discovers that the Otherworld Company is keeping drugged people – including Kat – in isolation capsules to test the game. Again in Otherworld, Simon finds himself in the "World of War," a realm fueled by rage, where, in a distinct shift in tone, Simon is compelled to fight and kill Carole, the woman who has been accompanying him.

Outside of Otherworld again, Simon discovers more about the nature of the virtual reality world from a friend Busara. Her father created some of the technology to help damaged kids live better lives, but then, realizing that the project was addictive and dangerous, told Milo, the company chief, that it must be ended, only to discover that Milo himself was addicted and living mostly in the virtual realm as Magna the Creator. Busara reveals that Kat is not really injured

but is being kept artificially paralyzed.  Moreover, in the virtual world, we learn, Kat is on the way to kill Milo.

### 3.   Comment

As this discussion indicates, the term "Otherworld" is a commonplace that has been employed many times both in artistic and in commercial contexts.  That the works at issue both use this term is not evidence of copying or substantial similarity.   As this discussion also indicates, fantastic "other worlds" of the kinds invoked in the works at issue are a familiar literary device employed in innumerable works, including by such classic authors as Lewis Carroll and L. Frank Baum.  That the works at issue both use this device is not evidence of copying or substantial similarity.  The *Defendants' Novel*, a work designed for a young adult audience, tells a story of young love and fantastic adventure set partially in the "real" world and partially in an imaginary cybernetic world.  This in itself is by no means unique as other fictions such as *Ready Player One* indicate, but in no significant way does it resemble the surreal fantasy evoked in the *Plaintiff's Materials*.  It is hard to say precisely what audience is anticipated for the show evoked by the *Plaintiff's Materials*, but, as, among other things, the thirty-something ages of the principal characters suggest, it is clearly not the same young adult audience for which the *Defendants' Novel* is designed.  As the formal categorical analysis that follows demonstrates, there is no substantial similarity in protected expression between the *Defendants' Novel* and any element of the *Plaintiff's Materials*, much less any instance of striking similarity.

### III. CATEGORICAL ANALYSIS

#### A.  Character

##### 1.  *Plaintiff's Materials*

*Alethea*. The Plaintiff's protagonist is a mature woman in her mid-30's with psychic gifts.

Alethea, whose name we are told means "truth," evidently also possesses other supernatural powers as suggested by a flashback in which she recalls being a child and levitating. Alethea lives alone in an apartment where she is visited by two mysterious figures, *Mademoiselle Femmale* and *Mr. Moro*, who come to lead her into a mystical other world. In the story Alethea will sometimes appear as her mature self and sometimes, in the other world, as a young girl.

*Mademoiselle Femmale*, Alethea's mentor, appears to be something of a hermaphrodite. This is suggested both by her name and by the "character design" included among the *Plaintiff's Materials*, which shows Femmale with a mustache, dressed in a man's suit and tie. She is accompanied by *Mr. Moro* who, apart from the "character design," which shows him with tattoos and wearing a hat and coat, is only thinly characterized.

*Julian*, the Plaintiff's male lead and Alethea's partner is described as "a handsomely rugged rogue" (*Plaintiff's Screenplay*, p. 2). From the "character design" Julian appears to be about Alethea's age. Like Alethea, in the story he will sometimes appear as his mature self and sometimes, in the other world, as a boy.

The *Charlatan* is a sketchily individuated figure who is killed by Julian in the opening episode. In the "character design" he appears distinctly diabolical.

The *Station Captain* is a mysterious and threatening woman, apparently something of a dominatrix, whose role in the story is not completely clear. She appears to have some authority over Julian but of what kind is obscure. After kissing and "groping" Julian, she commands him to find *Big Mind* in Otherworld. Exactly who or what "Big Mind" might be is also unclear.

The *Shadow Walkers* are a pair of mysterious and threatening characters who seem to represent a category of, possibly supernatural, thugs. Who they are and what their larger role in the story might be is not clear.

*The Watcher* is a fantastic figure, described as "a tall faceless, eyeless half man/half owl-like creature" (*Plaintiff's Screenplay*, p. 51), who presents himself as a guide to Alethea and Julian after they pass through the Gateway.

Additional characters briefly invoked in the *Plaintiff's Screenplay* include, in flashback, Alethea's mother, sister, and brother.  Furthermore, the *Plaintiff's Episode 2 Synopsis* invokes various vaguely defined figures including a shop owner, a character who seems to be Julian's father, and a mysterious individual named "Sir Real" foreshadowed in the *Plaintiff's Screenplay*, p. 33.

### 2.  *Defendants' Novel*

*Simon*.  The Defendants' protagonist is 18, a Jewish kid who lives with his parents in an upscale New Jersey suburb.  Sent away to boarding school, Simon is tightly bonded to Kat, with whom he has played ever since he was a child.

*Kat* is Simon's girlfriend and pal since he was a little boy.  Kat, who will be injured and diagnosed with "locked-in syndrome," lives nearby.  After her injury she will be kept alive in a vegetative state while Kat's stepfather, *Wayne Gibson*, will ultimately be revealed as the villain of the piece.

*Milo Yolkin* is a "geek genius" who has developed *Otherworld*, a totally immersive virtual reality game.  For much of the story he appears to be the villain but finally is revealed as addicted and the victim of his own invention.   In Otherworld he manifests as *Magna the Creator* who sits on a throne guarding the exit from Otherworld.

*Busara Ogubu* is a kid in the local high school, the daughter of the *Otherworld* designer, and a friend of Kat's.  She will turn out to be *Clay Man*, Simon's protector and guide in the virtual world and a figure in the story's resolution.

*Carole, Arkan,* and *Gorog* are Simon's virtual companions in his Otherworld adventure. Arkan manifests in Otherworld as a knight, Gorog as an ogre. In reality Carole is a soccer mom and Gorog a fourteen-year-old who has been hit by a car.

In addition to these principal characters the *Defendants' Novel* portrays a great many secondary figures, including two sinister engineers, Martin and Todd, and, in the gaming world, various grotesque or surreal figures associated with specific locales. Each of these locales has its own principal authority figure or "Elemental."

3. Comment and Conclusion with Respect to Character

The Plaintiff's and Defendants' protagonists – Alethea and Simon – are conspicuously different characters: Alethea is a mature woman with supernatural powers, Simon a quirky, affectionate Jewish teenager who has been sent away to a private school. I note in passing that as a fictional character Simon recalls J.D. Salinger's Holden Caulfield, the protagonist of *The Catcher in the Rye*. The same could not in any way be said of the Plaintiff's protagonist Alethea.

The Plaintiff's love interest or partner figure, Julian, is a mature man, a handsome and rugged "rogue," apparently, like Alethea, in his mid-30's. The Defendants' love interest figure, Kat, is a suburban teen who for much of the story is understood to be in a quasi-vegetative state. Whereas Julian accompanies Alethea on her journey into the otherworld, the Defendants' protagonist Simon is accompanied by a trio of avatars: Carole, Arkan, and Gorog. There is clearly no significant similarity between this trio of companions and the Plaintiff's character Julian. Nor is there any significant similarity between the partner or love interest figures, Julian and Kat, or for that matter between Kat and the Plaintiff's mature protagonist Alethea.

The Plaintiff's and Defendants' stories both portray "guide" figures. In the Plaintiff's story this role is assigned to the mysterious "Watcher," though exactly what role this character

will play in the projected "Otherworld" show is unclear.  In the Defendants' novel the "Clay Man" – in reality, Busara, the daughter of one of the game's designers – is presented as Simon's guide.  Other than the fact that both are guides, there is no apparent similarity between the Watcher and Busara/Clay Man.  That both stories employ guide figures is not in itself a significant similarity.  Such figures are a classic piece of narrative apparatus in fantasy adventure stories going back at least as far as Dante's guide Virgil in *The Inferno*.  Other familiar examples include Gandalf in *The Lord of the Rings* and Obi-Wan Kenobi in *Star Wars*.

There are of course a great many fantasy characters that the Defendants' protagonist Simon encounters in his adventures including the various "Elementals" or masters of the different imaginary realms and other grotesque and sometimes threatening figures.  None of these is in any meaningful way similar to any of the vaguely sketched fantasy figures such as the Shadow Walkers in the Plaintiff's work.

With respect to the category of Character, then, I conclude that there is no substantial similarity between the *Defendants' Novel* and the *Plaintiff's Materials*, much less any striking similarity.

B.  Plot

1. *Plaintiff's Materials*

The *Plaintiff's Materials* apparently project a multi-episode television series.  As currently presented they do not set forth a coherent plot.  Perhaps, however, they hint at a story that will involve a journey of discovery that will occur in the "Otherworld."  The opening episode, the one for which we have an actual screenplay, begins with a flashback to the protagonist's childhood.  Moreover, the second episode synopsis includes multiple invocations of Alethea and Julian's early lives.  At one point, for example, Alethea finds herself in a room

that resembles her childhood bedroom with shadow puppets that become sinister and threatening and lead to a nightmare vision in which one puppet "morphs into a sinister beast and rips into another puppet tearing it apart" (*Plaintiff's Episode 2 Synopsis*, p. 6).  At another, a menacing "Black Vapor" ominously declares, "Hello my sister, I love you" (*Ibid*).  And at still another, Julian encounters a mysterious figure who morphs into his estranged father (*Ibid*, p. 9).  Such details suggest that Alethea and Julian are embarked on a voyage of some kind of retrospective psychological discovery.  But of course this is merely speculation: key plot issues are teasingly evoked but not specified.  This is true, too, of the enigmatic figure known as "Big Mind" that Julian is ordered to find.  The *Plaintiff's Materials* are, as even the term "Teaser Packet" implies, only a teaser.  No overall plot structure is specified.

### 2.  *Defendants' Novel*

The *Defendants' Novel* incorporates a highly structured and elaborate plot that includes elements of strategic misdirection.  The basic premise of the plot is that an evil corporation is arranging accidents and sacrificing young people in order to test and perfect their virtual reality game.  These drugged and comatose gamers are being kept in capsules where their bodies are artificially supplied with nutrients not for medical reasons but "because," as the protagonist Simon explains, "the Company *wants* them to be here" (*Defendants' Novel*, p. 319).  Through much of the story we are led to assume that Milo Yolkin, the game's inventor, is the villain of the piece.  Ultimately we learn that Yolkin is in fact a victim of his own invention and that he, like the comatose young people, is locked in a capsule.  The real villain is Kat's stepfather Wayne Gibson.  Kat found the blueprints for the storage capsules in her stepfather's office and was going to expose him.   But then Wayne arranged an accident in which Kat was injured and herself put into a storage capsule.  The revelation that Kat's injury was arranged does not come

until late in the novel.  The story itself takes the form of a quest, Simon's journey into the

fantastic otherworld to find and free Kat.  The quest completed, Simon and Kat exit the virtual

game world and return to the real world.  Awakening there, Simon finds that he, like both Kat

and Milo Yolkin, is locked in a capsule.  Wayne Gibson, determined to find out who has been

helping Simon – this is, of course, Busara – releases Simon in order to question him.  Smirking

and brandishing a gun, Gibson tells Simon that he has shut off the "meds" that have been

sustaining both Kat and Milo, using this as leverage to compel Simon to speak.  But Gibson's

plan backfires as Milo begins to flatline.  While Gibson attempts to rescue Milo – "We need him

alive!" (*Defendants' Novel*, p. 350) –  Simon seizes the villain's gun.  Arrogant and over-

confidant, Gibson dares Simon to shoot, which Simon, surprising himself, does.  Releasing Kat

from her capsule and carrying her in his arms, Simon, aided once again by Busara, escapes from

the storage facility.

### 3.    Comment and Conclusion with Respect to Plot

The *Defendants' Novel* employs the plot pattern of the journey or quest, a pattern familiar

from innumerable classical and modern works including *The Odyssey, The Aeneid*, *The Divine

Comedy, Moby Dick, Huckleberry Finn*, and *The Lord of the Rings* among a great many others.

The *Plaintiff's Materials* perhaps contemplate a version of the same plot pattern, but it is difficult

to say precisely what the plot of the Plaintiff's work might be because the materials as presented

are fragmentary and incomplete.  The plot of the *Defendants' Novel* is designed to provide a

surprise twist when the real villain – Kat's stepfather – is revealed.  There is no indication

anywhere in the *Plaintiff's Materials* that a similar design is contemplated.  Nothing in these

materials suggests the foundation for a "bait and switch" story analogous to the highly structured

design of the *Defendants' Novel*.

With respect to the category of Plot, then, I conclude that there is no substantial similarity between the *Defendants' Novel* and the *Plaintiff's Materials*, much less any striking similarity.

## C.  Sequence of Events

### 1.  *Plaintiff's Materials*

The pilot episode for the Plaintiff's series begins with a flashback to Alethea's childhood and a brief introduction of the adult Alethea in her apartment.  We are then introduced to Julian at a nude dance show at a night club and then to the female Captain.  Mademoiselle Femmale and Moro visit Alethea and tell her she is a "seer" after which in Fray Town we are introduced to the drunk Shadow Walkers.  A series of flashbacks follows in which Alethea recalls mysterious childhood experiences after which, in the night club, Julian fights the Shadow Walkers and flees. Further incidents involving Alethea being instructed by Mademoiselle Femmale are intercut with incidents involving Julian and the Station Captain.  Alethea enters the power plant followed by Julian after which Alethea and Julian pass through the Gateway to the other world.  There they are transformed into a young girl and boy and are greeted by the Watcher.

The synopsis for the second episode, set in the other world, describes Alethea and Julian traveling by canoe to a mysterious house where Alethea finds herself in a room that resembles her childhood bedroom.  After this Alethea and Julian explore the town.  Mysterious events in a used clothing store, intercut with a secondary narrative focused on the Station Captain and Sir Real, lead to a clue about Big Mind.   Later the Station Captain appears disguised as a vagrant.

### 2.  *Defendants' Novel*

The novel starts with a prologue in which Simon tests a new release of the Otherworld adventure game and in the virtual world senses Kat's presence.  This leads to a long expository sequence in which Simon's backstory is developed along with that of his relationship with Kat.

Here too we get the story of Kat's disastrous injury, leading to "locked in syndrome," followed by two gaming company engineers, Martin and Todd, fitting her out with virtual reality equipment, despite Simon's protest that Kat is not really in a vegetative state.

The novel's adventure phase begins after about a hundred pages when Simon receives a mysterious shipment of VR equipment – we later learn this has been sent to him by Busara – together with instructions to find Kat in the virtual world. We now get a sequence of fantasy episodes that become increasingly ominous as the story advances. Launched into the gaming world, Simon finds himself in White City, the portal locale, where he is met by the mysterious Clay Man – in actuality Kat's friend Busara – who is to serve as Simon's advisor and guide although he will not actually accompany Simon on the journey. The Clay Man warns that Simon will encounter significant dangers, instructing him that to rescue Kat he must kill the giant Magna.

Setting off, Simon – much like Dorothy in *The Wonderful Wizard of Oz* – acquires several traveling companions: Arkan, whose avatar is a medieval knight; Gorog, an ogre; and Carole. Their first adventure is in the City of Imra, a luxurious resort that offers feasting, swimming, and sensual pleasures that might tempt a traveler such as Simon to give up his quest. Undeterred by the attractions of Imra or by Pomba Gira, the "Elemental" or presiding spirit of the place, Simon and his companions continue on their journey. It is perhaps worth noting that Imra conspicuously recalls Circe, the temptress figure of the *Odyssey*.

In an episode in which he temporarily returns to the real world for refreshment, Simon discovers that there have been dozens of cases of locked in syndrome in New Jersey and that the collapse of the factory in which Kat was injured was not an accident. After this, returning to the virtual world, Simon and his traveling companions journey to the realm of Mammon. On the

way they come to a glittering city where they encounter a "Child" – a native and not a visitor to Otherworld – and acquire a sack of diamonds. Escaping from assaults by savages and monkeys, the travelers reach Mammon.  This is a realm of gated mansions and expansive lawns as well as cannibalism, an image invoked with wry satiric humor.  As one resident says, "We all consume people on our way up the ladder, It's only natural that some of us learn to like it" (*Defendants' Novel*, p. 246).

Dragged into the real world through the intervention of the Clay Man, Simon discovers the facility where Kat's body has been stored and on his cellphone documents the dreadful way the Otherworld Company is using people's bodies.  Back in Mammon, Simon employs a trick to divert the rapacious residents with their own greed and advances with his companions to the temple of the local Elemental.  Demanding to be sent to the Creator – that is, Milo Yolkin – Simon finds himself abruptly transported to the World of War, a realm fueled by rage.  There Simon is compelled to fight one of the locals in a gladiatorial struggle.  Simon defeats his antagonist but then is compelled to a further contest in which Carole, telling Simon he must save all the prisoners of Otherworld, sacrifices herself.

After several dream visions in which Simon encounters first his dead grandfather and then Kat, he and Gorog bury Carole's body.  In a wry allusion to *The Matrix* trilogy Gorog insists that Simon is the "One," the hero destined to save the travelers.  Back in the real world, Simon finds himself with Busara, who now reveals key elements of the story, including the fact that she is the Clay Man and that it was she who sent Simon the VR equipment.  Together Simon and Busara visit Marlow, another youth from their town, who explains that he was indirectly responsible for the "accident" and Kat's injury.  Marlow tells Simon and Busara where to find the evidence that proves the accident was arranged.

Episodes that alternate between the virtual and real worlds portray Simon, accompanied by Gorog, coming to a city of skyscrapers and meeting Moloch, the local Elemental, who complains about the "Children." These are native Otherworld creatures that are said to incorporate Magna the Creator's DNA. Moloch explains that Kat is on her way to kill Magna, the figure who is in reality Milo Yolkin, the inventor of the virtual reality world. In this episode Gorog – in reality a 14-year-old boy – is killed. Now in the real world, Simon wakes on a gurney in a patient transport van with the two engineers, Martin and Todd, defending the company's activities as humanitarian: the sacrifice of a few individuals will make the world a better place. Taken to the facility where the gamers' comatose bodies are stored in capsules, Simon sees Kat's body and learns that Wayne, Kat's stepfather, is in fact the engineers' boss. Outraged, Simon attacks Martin, aided by Busara who fortunately appears and stabs the engineer with a syringe.

Back in the virtual world Simon wakes to find himself at last together with Kat. She explains that the Children, the native Otherworld creatures, have been helping her and will now lead Simon and herself to the Creator. "Milo's not evil," Kat says, "He's *immature*" (p. 331) and has lost control of Otherworld. Kat reveals that she was about to expose her stepfather's evil plans when Wayne conspired to foil her by arranging the "accident" in which she was injured. Now she and Simon must find Milo and convince him to leave Otherworld and expose Wayne. A confrontation with Moloch – in reality Moloch is Todd, the engineer – leads to the Children subduing the Elemental and vowing to take control of the virtual world.

Led by the Children, Simon and Kat find their way to Magna, Milo's avatar, who at first thunders and threatens but then – like the little man who emerges as the reality behind the Wizard of Oz – deflates and helps Simon and Kat to exit from the virtual world. Outside, Simon

wakes, finding himself in a capsule in the storage facility where Wayne – Kat's step-father and the real villain of the piece – threatens him. But then Wayne panics as Milo Yolkin's capsule begins to flatline. In a climactic finale Simon shoots Wayne, carries Kat away and, joined by Busara, escapes, fleeing to Texas. In an epilogue, Simon, Kat, and Busara hear a TV newscaster reporting that the Otherworld company has announced that Milo Yolkin will be taking a sabbatical and that this could delay the company's "eagerly anticipated" new version of its popular game.

### 3.   Comment and Conclusion with Respect to Sequence of Events

The sequence of events as sketched in the *Plaintiff's Materials* is comparatively simple: in the pilot episode Alethea and Julian are independently introduced, Alethea is instructed and guided by Mademoiselle Femmale while Julian is interviewed and groped by the Station Captain, after which they independently arrive at the Gateway and pass over to the other world. There Alethea and Julian are transformed into children. There they find themselves in a strange world where they encounter, among other things, significant echoes of their childhoods. Significantly, Julian receives a business card that anticipates his search for Big Mind.

The sequence of events in the *Defendants' Novel* is, as the necessarily long summary suggests, much more complex and intricate. I note that the protagonist's adventures in the virtual world do not begin until more than 100 pages into the story. They then take the form of a journey from one virtual locale to another: the White City, the City of Imra, the Realm of Mammon, the World of War, and the Kingdom of Moloch. The journey climaxes in Simon's reunion with Kat and their confrontation with Magna, after which, aided by Busara, Simon and Kat confront the villain Wayne in the storage facility where the gamers' somnolent bodies are maintained and escape to Texas. It is notable that even after the adventures in the virtual world

begin, the narrative shuttles back and forth between the "otherworld" and the "real" world of suburban New Jersey from which the principal characters come.

As these summaries demonstrate, there is no substantial similarity between the *Defendants' Novel* and the *Plaintiff's Materials* with respect to Sequence of Events, much less any striking similarity.

### D.  Setting

#### 1.  *Plaintiff's Materials*

The Plaintiff's story starts in the suggestively named "Fray Town" where locales include the protagonist's apartment, her childhood home, a nude-dancing night club, the Station Captain's office, the power plant in which the Gateway is located, and the Otherworld desert landscape.  Additional locales invoked in the *Episode 2 Synopsis* include a town with a mysterious house containing a room that resembles Alethea's childhood bedroom and a strange used clothing shop as well as a homeless encampment in Fray Town.  I note that the town in this second episode is reached by a water journey by canoe.

#### 2.  *Defendants' Novel*

The *Defendants' Novel* begins by invoking a wealthy New Jersey suburb, including Simon's house and Kat's mother's more modest house outside the town.  Other locales in or near the town include the local high school, the abandoned factory in which Kat is injured, a country club, a hospital, and the medical facility where the gamers' comatose bodies are stored.  The early part of the novel also invokes the private school to which Simon is sent when his parents move abroad.  The novel's virtual reality locales include the White City, a land of entry not greatly different from the real world; a seductive resort called the City of Imra; the Realm of Mammon, a region of gated mansions and expansive lawns; the World of War in which

gladiatorial contests are required; the Realm of Moloch, characterized by skyscrapers; and the glacier beyond which Magna sits like a god or monarch in his realm.

### 3.    Comment and Conclusion with Respect to Setting

Both the *Plaintiff's Materials* and the *Defendants' Novel* invoke supposedly "real" and contrasted "fantasy" locales.  There is no meaningful similarity, however, between the Plaintiff's sketchily drawn "Fray Town" with its nude-dancing club and power plant and the Defendants' wealthy New Jersey suburb with its large houses, high school, and medical facilities.  Nor is there any meaningful similarity between the Defendants' abandoned factory, the important locale in which Kat is injured, and the Plaintiff's power plant – the portal to the other world – or any other locale identified in the *Plaintiff's Materials*.  The various virtual reality realms in the *Defendants' Novel* are nothing like either the desert on the other side of the portal in the *Plaintiff's Screenplay* or the vaguely mysterious town invoked in the *Episode 2 Synopsis*.

As this analysis demonstrates, there is no substantial similarity between the *Defendants' Novel* and the *Plaintiff's Materials* with respect to Setting, much less any striking similarity.

### E.    Mood or Tone

#### 1.    *Plaintiff's Materials*

The *Plaintiff's Materials* invoke a surreal story that is ominous in mood.  This is generated by the invocation of figures like the threatening Shadow Walkers or the mysterious Station Captain and episodes such as that in the *Episode 2 Synopsis* in which Alethea, in a room that recalls her childhood bedroom, watches a shadow puppet morph into a sinister beast.  One may appropriately think of the classic Edvard Munch expressionist painting "The Scream."  This shows a distorted sexless figure, hands holding its bald skull of a face, standing on a mysterious bridge and attempting to scream.  Just so, the Plaintiff sketches an expressionist nightmare that is

more evocative than specific.

### 2.   Defendants' Novel

The *Defendants' Novel* begins with a relatively realistic section of about a hundred pages reminiscent of *The Catcher in the Rye*. It then moves into its adventure phase. Here the various locales – The White City, the luxurious City of Imra, the Realm of Mammon, The World of War – become increasingly ominous. But the nightmare quality of the latter part of the novel is qualified by a prominent thread of humor and ironic allusion to popular culture. For example, when Gorog the ogre – in reality a fourteen-year-old boy – is offered the opportunity "to assume a more conventional appearance" he responds, like a guest being offered a refill of his drink at a party, "No thanks, I'm good" (p. 148).  Later, as the journeying party discusses the dangers that may lie ahead, the Clay Man mentions Mammon. "Like the guy from *Spawn?*" Gorog asks. "I was thinking of the Mammon in *StarCraft*," Simon says, "You ever play that?" (p. 184). The novel also playfully invokes the *Matrix* trilogy when Gorog insists that Simon is "the One." "I'm *not*," Simon retorts, "You've watched too many movies" (p. 272).  I note, too, that Simon's self-consciousness about his "giant schnoz" (p. 11) – the prominent nose that runs in his family from his grandfather, "the Kishka," through his mother, who has had a "nose job" – is a continuing humorous motif.

### 3.   Comment and Conclusion with Respect to Mood or Tone

In mood or tone, then, the works in question are clearly different. The story suggested in the *Plaintiff's Materials* is surreal and ominous. The *Defendants' Novel* portrays surreal and nightmarish incidents but qualifies the solemnity with humor and ironic invocations of popular culture. No equivalent element of humorous leavening is apparent in any aspect of the *Plaintiff's Materials*. As this analysis demonstrates, there is no substantial similarity between the

*Defendants' Novel* and the *Plaintiff's Materials* with respect to Mood or Tone, much less any striking similarity.

## F.  Pace

It is of course difficult to compare the pace of a projected television series with that of a novel.  Nonetheless with respect to this element as well, the works are clearly different.  Both works portray adventures in a surreal realm, the psychologically charged fantasy realm evoked in the *Plaintiff's Materials* and the virtual reality game world of the *Defendants' Novel*.  The *Plaintiff's Materials* portray mysterious pursuits and struggles from early on as the mysterious Shadow Walkers break into the nude dancing night club and pursue the fleeing Julian. The *Defendants' Novel* starts with a prologue in which Simon tests a new release of the Otherworld adventure game, however, the novel does not begin its surreal adventure phase until about a hundred pages into the work.  I note, too, that the *Defendants' Novel* repeatedly interrupts the protagonist's adventures in the virtual reality world by having Simon return to the real world for refreshment and to make discoveries that advance the plot.  The *Plaintiff's Materials* give no indication that any such alternation between realms is contemplated.

With respect to the category of Pace, then, there is no substantial similarity between the works at issue, much less any striking similarity.

## G. Theme

The story sketchily invoked in the *Plaintiff's Materials* appears to be psychological in theme: Alethea and Julian seem to be launched on an adventure in the course of which they will discover truths about their selves and their past histories.  The very different *Defendants' Novel* revolves around the exposure of an evil scheme that would sacrifice young people for commercial reasons.  "Beware of ruthless corporations profiting from the exploitation of

innocent people" would be one way of stating the theme of the *Defendants' Novel*. Alternatively, focusing on the exploited youths, one might describe the novel as a warning about the dangers of computers and technology. In either case, the theme of the *Defendants' Novel* in no way resembles that of the *Plaintiff's Materials*. Whereas the Plaintiff's work is inward looking and emotional, the Defendants' story is social and satirical.

With respect to the category of Theme, then, I conclude that there is no substantial similarity between the *Defendants' Novel* and the *Plaintiff's Materials*, much less any striking similarity.

### G.  Dialogue

There is no substantial similarity between the works at issue with respect to Dialogue or for that matter any other category of language, much less any striking similarity.

### IV. PLAINTIFF'S ALLEGATIONS OF SIMILARITY

### A.  Plaintiff's Allegations

The Plaintiff's *Complaint* incorporates some 42 pages of alleged similarities between the Defendants' "Book Series" and the Plaintiff's "Intellectual Property" (*Complaint*, pp. 31-73). This list of allegations starts with six general allegations beginning with the title and including propositions related to setting, genre, mood, and theme. These topics have all been addressed in preceding sections of my discussion. The matter of title, for example is addressed in Section II above, where I note multiple examples that indicate the use of "otherworld" as a name or title is a commonplace and does not constitute evidence of copying or substantial similarity. Furthermore, I am instructed that titles are not protected by copyright. The matters of setting, genre, mood, and theme have also been addressed in my analyses above. The list of allegations then proceeds to some 42 pages of "Text Examples" of alleged similarities. I note that the

Plaintiff does not provide page references either to her own work or to the *Defendants' Novel*. Nor does the Plaintiff number the individual allegations.

I have examined all 42 pages of the Plaintiff's allegations of substantial similarity and concluded that they do not establish substantial similarity. In the interests of efficiency and economy, I limit my discussion to the first nine. I have introduced numbering for the sake of convenience in reference.

Allegation #1 (*Complaint*, p. 32)

| Plaintiff's Material | Defendant's Novel |
| --- | --- |
| "It's a virtual, three-dimensional, holographic labyrinth…More vivid than any video-game you'll ever play…" "Alethea is stuck in a maze." | "…we're in some kind of *game*? "…a very advanced virtual reality…" "So what- -we're stuck in this place?" |

This allegation is inaccurate with respect to the *Plaintiff's Materials* insofar as it cites several phrases that do not appear in those materials. The phrase "More vivid than any video-game you'll ever play" does not occur in the *Plaintiff's Screenplay*. Nor does the phrase "Alethea is stuck in a maze." The term "maze" does occur when Mademoiselle Femmale is described as leading Alethea through the "dark industrial maze" of the power plant – see *Plaintiff's Screenplay*, p. 41 – but there is no indication in this incident that Alethea is "stuck."

Furthermore, the allegation improperly extracts fragments from their context. The phrase "virtual, three-dimensional, holographic labyrinth" comes from the incident in which Mademoiselle Femmale employs "hallucinative holographic images" shown in a black box theater to prepare Alethea for her adventure. As Mademoiselle Femmale tells Alethea, "This three dimensional virtual labyrinth is divinely designed for your soul's initiation" (*Plaintiff's Screenplay*, p. 27). There is no meaningful parallel between this incident and the exchange between the Defendants' characters Carole and Simon. Carole, puzzled by her surroundings,

asks "Are you telling me we're in some kind of *game*?" to which Simon replies "This is very advanced virtual reality."  "So what – we're stuck in this place?" Carole exclaims" (*Defendants' Novel*, p. 131).

Allegation #1 fails because it inaccurately represents the *Plaintiff's Materials*.  It also fails because it extracts fragments from their contexts, combining them to create a misleading impression of similarity.

Allegation #2 (*Complaint*, p. 32)

| Plaintiff's Material | Defendant's Novel |
|---|---|
| "Alethea tries to keep up with the changing environment." "Everything is, as it is, and never what it seems." | "…but it is constantly changing." Nothing here is what it was originally meant to be." |

This allegation, too, is inaccurate with respect to the *Plaintiff's Materials.*  The alleged passages about the "changing environment" and things not being what they seem appear nowhere in either the *Plaintiff's Screenplay* or in the *Plaintiff's Episode 2 Synopsis.*

That said, the allegation asserts a parallel with the passage in the *Defendants' Novel* in which one of the Otherworld Children remarks: "The Creator gave life to this world, but it is constantly changing.  Nothing here is what it was originally meant to be" (*Defendants' Novel*, p. 328).  The passage in the *Defendants' Novel* suggests that the virtual world is evolving independently of its original design.  Nothing in the *Plaintiff's Screenplay* suggests anything even remotely similar.

This allegation fails because it inaccurately represents the *Plaintiff's Materials* and because the passages in question are not in fact similar.

Allegation #3 (*Complaint*, p. 32)

| Plaintiff's Material | Defendant's Novel |
|---|---|
| "Is it just one, two, three, perhaps four, or the sum of all?" What of the five senses, you say?!" "It can be all too frightening, getting trapped within the mires of the mind." | "That's how Otherworld traps you. "It introduces you to sensations you'd Never be able to feel in real life." |

This allegation, too, is inaccurate with respect to the *Plaintiff's Materials*. The allegation cites a passage of dialogue ("Is it just one, two, three, perhaps four . . .") that does not appear in any of the *Plaintiff's Materials* at issue. It alleges substantial similarity to a passage in the *Defendants' Novel* – "That's how Otherworld traps you" *(Defendants' Novel*, p. 257) – that invokes the addictive dangers of virtual reality gaming. Aside from the fact that the allegation is inaccurate with respect to the *Plaintiff's Materials*, I note that the issue of game addiction is not one that the *Plaintiff's Materials* raises.

The allegation fails because it inaccurately represents the materials in this matter and because the substance of the passage from the *Defendants' Novel* is without parallel in the *Plaintiff's Materials*.

Allegation #4 (*Complaint*, p. 32)

| Plaintiff's Material | Defendant's Novel |
|---|---|
| "It's a virtual, three-dimensional, holographic labyrinth divinely designed for your initiation." What of the five senses…?!" | "This is true virtual reality- -not just Sight, sound, and touch. Tap into the brain…you can engage all five senses." |

This allegation, too, is inaccurate with respect to the *Plaintiff's Materials*. The cited passage from the *Plaintiff's Materials* does not begin or end as alleged but simply states "This three dimensional, virtual labyrinth is divinely designed for your soul's initiation" (*Plaintiff's Screenplay*," p, 27). The *Plaintiff's Materials* do not include the fragment "What of the five

senses . . .?!"

   The context from which the original of the Plaintiff's inaccurately represented passage is taken is also quite different from that in the *Defendants' Novel*.  In the *Plaintiff's Screenplay* Mademoiselle Femmale has taken Alethea to a theater for a three-dimensional holographic show to instruct her in the metaphysics of Otherworld.  In the *Defendants' Novel* the engineer Todd is explaining the gaming company's advances in virtual reality gaming.  This incident occurs in the hospital to which Kat has been taken for treatment after the accident.

   The allegation fails because it is inaccurate and because it ignores the very different contexts in which the passages appear and consequently also the difference in meaning and significance.  I note that the concept of "soul" which is prominent in the accurate representation of the passage from the *Plaintiff's Screenplay* does not appear in the *Defendants' Novel*.


Allegation #5 (*Complaint*, p. 32)

| Plaintiff's Material | Defendant's Novel |
|---|---|
| "…virtual, three-dimensional, holographic labyrinth…designed for your initiation. "…can you discern an illusion…defining difference?" "virtual holograms…summoned by Mlle…" | "…it's a hologram…" "That's not a hologram," I argue." "And even if it is, how would you know?" "…three-D hologram projector produces …life-like image." "…three-D images…" "…won't know who's real…who's not." |

   This allegation, too, is inaccurate with respect to the *Plaintiff's Materials*.   The phrases "can you discern an illusion . . . defining difference?" and "virtual holograms . . . summoned by Mlle" do not appear in the registered draft of the *Plaintiff Screenplay*.  The actual passage reads simply "This three dimensional, virtual labyrinth is divinely designed for your soul's initiation" (*Plaintiff's Screenplay*, p. 27).  The passage is extracted from the episode in which Mademoiselle

Femmale takes Alethea to a theater where she presents a "hallucinative holographic" display (*Ibid*).

The cited episode in the theater to which Mademoiselle Femmale takes Alethea bears no resemblance to the allegedly similar collection of phrases extracted from the *Defendants' Novel*. These come from an episode in which Simon and Busara find Marlowe, a friend, apparently working out in a gym at his house. In fact Marlowe is using a holographic projection to distract surveillance. The incident in the *Defendants' Novel* bears no resemblance to that in the *Plaintiff's Screenplay* and there is no significant parallel between the fragmentary phrases cited in relation to the works in question.

The allegation fails because it is inaccurate and because it improperly extracts fragments of language from the contexts that give these passages meaning. Again I note that the concept of "soul" which is prominent in the accurate representation of the passage from the *Plaintiff's Screenplay* does not appear in the *Defendants' Novel*.

Allegation #6 (*Complaint*, p. 32)

| Plaintiff's Material | Defendant's Novel |
|---|---|
| "Are you real? Is this really happening?" "We are as real as you believe, my dear." "…it is very real for me." | "Yeah, but you're not real are you?" "*Real?*" she answers." "Of course, I'm real." |

This allegation cites a passage in the *Plaintiff's Screenplay* in which Alethea is puzzled by Mademoiselle Femmale's appearance in her apartment together with Mr. Moro. "Are you real? Is this really happening?" Alethea asks, to which Mademoiselle Femmale replies, "Well! We are as real as you believe my dear. I can assure you it is very real for me!" (*Plaintiff's Screenplay*, p. 8). The allegation asserts a parallel with the episode in the *Defendants' Novel* in which Simon enters a café in the virtual world and is greeted by a waitress. Simon remarks that the café is empty to which the waitress responds, "I'm here." "Yeah, but you're not real, are

you?" he says.  "Real?" she answers. "Of course I'm real."  Simon then goes on to ask what the waitress means: is she "real" in the sense that she is a human player's avatar or is she a figure generated by the game program? (*Defendants' Novel*, p. 107).

I note that the passage in the *Plaintiff's Screenplay* occurs in Alethea's apartment in the "real" world.  Alethea is startled by the appearance of Mademoiselle Femmale and Mr. Moro and wonders whether she is imagining them: "Are you real? Is this really happening?"  The allegedly parallel passage in the *Defendants' Novel* occurs in the virtual gaming world.  Simon reasons that the waitress must either be part of the game program or the avatar of a player like himself.  When Simon tests the waitress by making a fantastic statement about being on his way to Pluto in a flying saucer, the waitress seems to play along and Simon remains puzzled.  "She's "either the most dedicated human waitress I've ever met – or the most impressive NPC [non-player character] ever designed," he says (*Defendants' Novel*, p. 108).  There is of course no question about whether the Plaintiff's characters Mademoiselle Femmale and Mr. Moro are generated by a game program.  Game "avatars" are no part of the *Plaintiff's Screenplay*.

The contexts for the allegedly parallel statements are clearly different.  The episode in the *Plaintiff's Screenplay* occurs in the supposedly "real" world, that in the *Defendants' Novel* occurs in the game world.  The Plaintiff's character Alethea is puzzled by the apparition of the two strange figures in her apartment.  When Alethea asks "Are you real?" she is asking, in effect, "Are you a figment of my imagination?"  The Defendant's character Simon is puzzled as to whether the apparently ordinary waitress is merely a figure generated by the game program – that is, a product of the Otherworld technology.  Technology of this – or any other – kind does not figure in the episode in Alethea's apartment.

Restored to the contexts in which they appear it is apparent that the allegedly parallel

exchanges between Alethea and Mademoiselle Femmale and the Defendants' character Simon and the waitress are very different. The allegation fails because it improperly extracts the exchanges from the very different contexts in which they appear and because it ignores the very different meanings of the questions that Alethea and Simon pose, the one to the exotic figure Mademoiselle Femmale and the other to the ordinary figure of the waitress. In context it is apparent that there is no significant parallel between the two passages.

Allegation #7 (*Complaint*, p. 33)

| Plaintiff's Material | Defendant's Novel |
|---|---|
| "This is just one world in which to awaken from…Otherworld is quite another." | "Otherworld is something else entirely." "…think of this as a new reality." |

This allegation cites a passage in the *Plaintiff's Screenplay* in which Mademoiselle Femmale, standing at a bus stop in Fray Town imparts what the Screenplay calls "weighted words" to her disciple Alethea: "This is just one world in which to awaken from my dear. Otherworld is quite another" (*Plaintiff's Screenplay*, p. 27). The allegation asserts a parallel with a passage in the *Defendants' Novel* set in the White City, the entry point to the game world, in which the Clay Man explains to Simon the difference between those who play Otherworld with headsets and those fitted with implanted "disks." "The guests with headsets are inside a game," the Clay Man says. "For those with disks, Otherworld is something else entirely. The only way to ensure your survival is to think of this as a new reality" (*Defendants' Novel*, p. 113). The Plaintiff's character Mademoiselle Femmale is explaining that the real world is one dream, the Otherworld is "another." The Clay Man, on the other hand, is drawing a contrast between playing Otherworld with a headset and with an implanted disk. For those playing with implanted disks the stakes are higher: survival is at stake.

Restored to context, it is evident that the passages are quite different. Like several of the

preceding allegations, Allegation #7 fails because it ignores the different contexts in which the allegedly parallel passages occur and their quite different meanings.

Allegation #8 (*Complaint*, p. 33)

| Plaintiff's Material | Defendant's Novel |
|---|---|
| "Show us a new dream, within a dream within a dream." | "You're a dream inside a virtual world." |

This allegation asserts a similarity with respect to dialogue.  The passage attributed to the Plaintiff appears nowhere in the registered draft of the Plaintiff's work.  The passage attributed to the Defendants' occurs well into the novel when Simon, dismayed by Carole's death, magically finds himself first with his dead grandfather and then with Kat.  "I'm here," Kat says, but Simon dismisses Kat's apparition, saying she's merely "a dream inside a virtual world" (*Defendants' Novel*, p. 270).  Kat then urges Simon not to give up his quest – that is, to be the hero he fears he may not be.  "You're supposed to keep going," Kat says (*Ibid*).  This incident marks the low point in Simon's quest, a despairing moment in which he is recommitted to his task by a vision of his beloved.

This allegation fails because it represents the Plaintiff's work inaccurately and does not take account of the context in which the passage from the Defendants' novel is taken.  I note that when Simon describes Kat's apparition as a dream inside a "virtual world," he means the term "virtual" quite literally: Simon knows he is at this point inside the game world.

Allegation #9 (*Complaint*, p. 33)

| Plaintiff's Material | Defendant's Novel |
|---|---|
| "What is the defining difference? And, how would you even know?" "Which way is out?" "What if you can't decipher?" | "The real world?" "Why is your world the real one? How can you be so certain…" "It's a good question… |

This allegation asserts a similarity with respect to dialogue, but the passages attributed to

the Plaintiff appear nowhere in the registered draft of the Plaintiff's work.  The passage

attributed to the Defendants occurs close to the end of the novel (*Defendants' Novel*, p. 339).

Here a "Child," one of the characters "native" to the game world, challenges Kat's assumption

that hers is the "real" world.  There is no indication in the Plaintiff's materials that her work

opposes a game world to a real world.  The allegation fails because it asserts a parallel where

none exists.  The allegation also fails because it misrepresents the version of the Plaintiff's work

at issue.

### B.  Comment and Conclusion with Respect to Plaintiff's Allegations

A list of alleged substantial similarities, no matter how long, can only be persuasive if the

principles of analysis on which it is based are sound.  The Plaintiff's allegations are often

inaccurate in their representation of the works at issue, among other things frequently citing

passages that do not appear in the Plaintiff's registered work.  Many of the allegations fail

because they wrench passages from their contexts and confuse very general ideas with concrete

expression, asserting false parallels and ignoring the particulars that individuate a literary work.

I also note that they take no account of *scènes à faire* or commonplace elements that must not be

confused with distinctive elements.   I conclude then that the Plaintiff's allegations with respect

to substantial similarity do not survive examination and analysis.  In no respect can the works at

issue be considered substantially similar in protected expression.

### V.  GENERAL CONCLUSION

I have analyzed the works at issue to consider whether any similarities between them

indicate that the *Defendants' Novel* made use of any element of the *Plaintiff's Materials* in any

way.  Taking into account the usual categories that one employs in matters of this sort –

Character, Plot, Sequence of Events, Setting, Mood or Tone, Pace, Theme, and Dialogue – I have

demonstrated that the *Plaintiff's Materials* and the *Defendants' Novel* are in no respect substantially similar.  I have also taken account of *scènes à faire* and commonplace elements that must not be confused with distinctive elements.  In addition I have considered the Plaintiff's allegations of similarity as incorporated in the *Complaint*.  It is my conclusion that there are no substantial similarities between any element in the *Plaintiff's Materials* and the *Defendant's Novel*, much less any striking similarities.   It is my conclusion, then, that there is no evidence that the Defendants have taken any elements of protected expression from the Plaintiff's work.  Indeed, it is my finding that there is no evidence that the Defendants have made use of or employed the *Plaintiff's Materials* in any way.  Logically, then, it follows that the *Defendants' Novel* and the *Plaintiff's Materials* were independently created.

Respectfully submitted,

Mark Rose

February 28, 2022